# United States Court of Appeals
## For the First Circuit

No. 98-1282

UNITED STATES,

Appellee,

v.

ALBERT KENRICK,

Defendant, Appellant.

No. 98-1283

UNITED STATES,

Appellee,

v.

DEREK OBER,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Chief Judge,
Selya, Boudin, Stahl, Lynch and Lipez, Circuit Judges,
Coffin and Campbell, Senior Circuit Judges.

Harry C. Mezer, with whom William A. Brown was on brief, for appellant Albert Kenrick.
Terrence F. Sheehy for appellant Derek Ober.

Ellen R. Meltzer, U.S. Department of Justice, with whom Donald K. Stern, U.S. Attorney, and Christopher L. Varner and Clifford I. Rones, U.S. Department of Justice, were on brief and Kirby A. Heller, U.S. Department of Justice, was on supplemental brief, for appellee.

August 2, 2000

OPINION EN BANC

**LIPEZ, Circuit Judge**.  Albert Kenrick and Derek Ober appeal from judgments of conviction entered after a jury trial in the United States District Court for the District of Massachusetts.  The jury found Kenrick guilty of one count of bank fraud and Ober guilty of four counts of bank fraud and one count of perjury.  They argue, for the first time on appeal, that the district court erred in instructing the jury on the intent required for a bank fraud conviction.  Although the panel that originally heard this case agreed with the defendants, it held that there was no plain error warranting reversal.  See United States v. Kenrick, No. 98-1282, slip op. at 22, 33 (1st Cir. Feb. 22, 2000) (withdrawn).  A majority of the circuit judges in active regular service ordered rehearing en banc and requested supplemental briefs on the intent issue.  We now hold that, contrary to the defendants' argument and the earlier holding of the panel, "intent to harm" is not an element of bank fraud.  We take this opportunity to clarify the nature of the intent element required for a bank fraud conviction.  We also reject both defendants' challenges to the sufficiency of the evidence, as well as sundry arguments raised by Ober.  We therefore affirm the convictions.

## I.   BACKGROUND

We recite the facts in the light most favorable to the jury's verdict. See United States v. Escobar-de Jesus, 187 F.3d 148, 157 (1st Cir. 1999). In 1986, at the height of "New England's late, lamented real estate boom," United States v. Lilly, 983 F.2d 300, 302 (1st Cir. 1992), Derek Ober was the president of the Wakefield Cooperative Bank ("WCB" or "the bank") in Wakefield, Massachusetts. WCB is a state-chartered bank that has been insured by the FDIC since January 1986. Albert Kenrick, a real estate investor with substantial property in eastern Massachusetts, who had done business with WCB in the past, had an incentive to sell real estate in which he had large gains before January 1, 1987, because of a pending increase in capital gains taxes.

## A.  222 Stackpole Street

Among Kenrick's properties was an eighteen-unit apartment building at 222 Stackpole Street in Lowell, Massachusetts.  Kenrick discussed with Emily Flynn, a real estate broker whom he had dated in the past, the possibility of converting the building to condominiums and having Flynn sell them for him.  Possibly contemplating the tax advantages of a sale before the end of 1986, however, Kenrick decided to sell the apartment building.  Flynn had recently made a large profit on another condominium conversion, and she was interested in

-4-

buying the Stackpole Street building with a partner. Although she wanted to have the same partner that she had had on her recent successful condo deal, Kenrick told her that Ober--whom Flynn had never met before--was interested in buying the property and that Kenrick preferred that Flynn and Ober purchase it as partners. On October 5, 1986, Flynn cooked a spaghetti dinner for Kenrick and Ober, and they negotiated a price for the Stackpole Street property of $935,000.

Flynn asked Ober where they could get financing for the purchase, and he answered, "Right here at this bank," i.e., WCB. Ober instructed Flynn that the loan application should be made in her name alone, even though they were equal partners, because he was going through a divorce. When she expressed doubt that she alone could qualify for such a large loan, he assured her that she could, and he filled out the application for her. Ober called John (Jay) Kimball, a lawyer who frequently represented WCB in mortgage transactions, and asked him to handle the paperwork for the Stackpole Street purchase. Kimball drafted the Riverview Development Trust, with Flynn as the trustee and only listed beneficiary, to hold title to the property. On Ober's instructions, Kimball also told Kenrick's attorney, who had drafted a purchase and sale agreement listing both Flynn and

Ober as purchasers, that Flynn was to be listed as the only buyer.

An application for a $900,000 mortgage on the Stackpole Street property was filed with WCB. Pursuant to the standard procedure for mortgage applications at WCB, the applications went initially to Ober, who was both president and the bank's sole loan officer. The applications were then reviewed by two members of the Security Committee, a subcommittee of the Board of Directors, who set a value for the property, typically by visiting it themselves, without an outside appraisal. If approved by the Security Committee, loans would come before the Board of Directors at its monthly meeting for ratification. There was an unwritten policy that Board members should abstain from voting on loans in which they or their relatives had an interest.

Ober and another member of the Security Committee visited Stackpole Street, valued the property at $1,125,000, and recommended approval of the mortgage. The minutes of the Board of Directors meeting of November 26, 1986, indicate that the Board approved the Flynn loan. Three members of the Board, however, testified that the loan was never presented to them for a vote and that Ober never disclosed to them his interest in the property. An FBI document analyst testified that the entry in

the Board minutes listing the loan was typed at a different time and with a different typewriter ball or wheel than the rest of the page.

The transaction closed on December 24, 1986. WCB provided a check for $900,000 and Flynn took title to the property as trustee of the Riverview Development Trust. Flynn herself provided the $50,000 down payment because Ober said he could not pay his half due to his pending divorce. The property was converted to condominiums, and seventeen of the eighteen units sold quickly, allowing Flynn to pay off the WCB loan in eight months. She shared the substantial profits equally with Ober, after repaying herself her contribution of his portion of the down payment. Ober assisted Flynn throughout the sales process, and managed to sell several units to friends and acquaintances, most of whom financed their purchases through WCB mortgages.

The eighteenth unit was harder to sell. Title to that unit was transferred to another trust prepared by Attorney Kimball, the D & E Realty Trust. Ober told Kimball that he had an interest in the unsold unit. Kimball therefore prepared two statements of beneficial interest for the trust, one listing Flynn as 100% beneficiary and the other listing Ober as 100% beneficiary; according to Flynn, they were equal partners in D

& E as in Riverview.  Ober was present when the trust was executed.  He received half the net income from D & E and dealt with a condominium owner whose unit was damaged by flooding in the unit owned by D & E.

From the beginning of the transaction, Ober took steps to conceal his interest in 222 Stackpole Street.  He arranged that Flynn should take title from Kenrick in her name only, as trustee of the Riverview Development Trust, and that she should be listed as the sole borrower on the $900,000 loan from WCB to purchase the property.  Ober had a motive to conceal his interest because, as the jury was told, a loan of that nature to a bank officer was forbidden by Massachusetts law.  See Mass. Gen. Laws ch. 170, § 19.[1]  When Flynn was deposed by the attorney for the former Mrs. Ober, Ober instructed her to perjure herself by stating that he had no interest in the Stackpole Street property, and she did so.  Before Flynn was questioned by the FBI, Ober told her, "I'll never admit to anything."  Ober also denied his involvement in the Stackpole Street transaction at a 1991 WCB Board meeting.

---

[1]The jury was also told that the Federal Reserve Board's Regulation O required a bank officer to disclose his interest in a loan to the bank's board of directors and to abstain from voting on the loan.  See 12 C.F.R. pt. 215.

## B. 8-10 Emerson Street

At around the same time that he sold the Stackpole Street property, Kenrick sold a six-unit apartment building located at 8-10 Emerson Street in Wakefield to Chung Lee and her parents. The Lees were Korean immigrants who had formerly lived in a different building owned by Kenrick. They had purchased a two-family house on Willow Street in Melrose, Massachusetts, in 1983. Kenrick, who was dating Chung Lee, told her that he could teach her how to make a million dollars by investing in real estate. He suggested to her that she and her parents buy his Emerson Street building for $325,000. He advised financing the purchase with two loans from WCB: first, a $150,000 refinancing of the mortgage on the Willow Street property, which would provide money for the down payment, and then a $260,000 mortgage on 8-10 Emerson Street.

Although Chung Lee filled out an application for the Willow Street refinancing and filed it at WCB, it was not acted upon immediately. The original application was marked "Hold" in Ober's handwriting. After Kenrick met with Ober to negotiate the Stackpole Street sale, however, the refinancing was approved, with the commitment letter dated October 22, 1986. Kenrick himself filled out the application for the Lees' Emerson Street mortgage, and his appointment calendar indicated that he

gave it to Ober personally on November 3, 1986. The Board of Directors ratified the Willow Street loan on November 26 and the Emerson Street loan on December 18. The sale of 8-10 Emerson Street closed on December 18.

As alleged by the government, there was evidence of a quid-pro-quo agreement between Kenrick and Ober that Kenrick would sell 222 Stackpole Street to Flynn and Ober and, in exchange, Ober would provide financing through the bank to allow Kenrick to sell 8-10 Emerson Street to the Lees. Following his spaghetti dinner meeting with Flynn and Ober on October 5, 1986, where they negotiated the Stackpole Street deal, Kenrick made a note that "I agreed at 935,000 to keep good rapport with Derek and thought with his financing ability & Emily's condo sales experience we could all be happy." In Kenrick's 1986 appointment calendar, otherwise filled with detailed notes for most days of the year, the page for October 4-6 is missing. Within three weeks of the October 5 meeting the loan to refinance the Lee family's property on Willow Street in Melrose, submitted to WCB in August and marked "Hold" in Ober's handwriting, had been approved; within two more weeks, the application for the $260,000 mortgage for the Lees to purchase 8-10 Emerson Street had been completed by Kenrick and delivered by him to Ober.

In addition, the agreement between Ober and Kenrick was testified to by Chung Lee. She testified that Kenrick told her, in explaining why he sold 222 Stackpole Street to Flynn and Ober, that "Mr. Ober can lend me the money because he's the Bank President. So, you know, that will work out very well." When asked what the relationship was between the Stackpole Street deal and Kenrick's sale of other properties, including 8-10 Emerson Street, she answered first, "Well, because if Bert [Kenrick] helps Derek Ober, Derek Ober can help Bert to sell other properties." When asked again what Kenrick had said about the relationship between the different deals, she answered:

> Because Bert sold it to Derek, Stackpole Street, that's why he can sell his Tuttle Street commercial properties. And 8-10 Emerson Street, he can sell. And he can also sell Methuen property at 175 Haverhill Street, for I think, a million dollars or $900,000. I cannot remember. But he can sell that because Bert help Derek Ober to make money. That way, you know, he can help Bert later.

Chung Lee married Kenrick in October 1988 and was still married to him at the time of trial in October 1997, although divorce proceedings were then pending. She and her parents continued to own the Emerson Street property, but had to obtain an additional loan from WCB to cover cash flow problems. Eventually, after the tenants were forced to move out when Chung Lee (now Chung Kenrick) contaminated the building in attempting

-11-

to remove lead paint, she defaulted on the mortgage and filed for bankruptcy. The bank wrote off a loss of $119,645.84 on the Emerson Street mortgage.

## C. DGB Realty Trust

In September 1985, Ober formed the DGB Realty Trust with WCB Treasurer Glenn Gates and William Upton, a retired local police officer. DGB bought three condominium units in Hudson, Massachusetts, and financed the purchases through Greater Boston Bank. DGB lost money from the start, and its checking account at WCB soon contained insufficient money to pay the trust's bills. To cover the shortfall, Ober decided to issue a demand loan from WCB to DGB for $15,000 on December 4, 1986. On December 11, 1987, the amount of the demand loan was increased to $25,000. Although there was testimony that some bank employees, and possibly some members of the Board of Directors, knew of the interest of Ober and Gates in DGB, three directors testified that Ober did not disclose the demand loan to the Board. In January 1988, the DGB demand loan was paid off with the proceeds of a new demand loan in the name of William Upton. Although the new loan was in Upton's name alone, Ober and Gates were still each responsible for one-third of the debt. Ober and Upton paid off their shares, but Gates still owed money on his at the time of trial.

-12-

The demand loans did not turn DGB into a profitable venture, and on multiple occasions checks were written on DGB's account at WCB although there were insufficient funds to cover them. At that time WCB did not offer its customers overdraft protection or lines of credit. If a check was presented for payment with insufficient funds in the account, customers were typically allowed to make it good by depositing funds on the same day the check was presented; if they could not, the check bounced. Apparently checks were sometimes held for longer periods for bank employees or Board members. On Ober's instructions, however, DGB checks were held for unprecedented lengths of time, after the checks were paid and without sufficient funds in DGB's account to cover them. Fourteen checks, totaling over $36,000, were held for a total of 576 days; no checks bounced, and DGB payed no interest or fees. The last of these was the largest: check number 182, in the amount of $6,780.42, was presented for payment, and paid, on March 17, 1988, but there were insufficient funds in the DGB account to cover it until January 6, 1989.

**D. Ober Deposition**

The WCB Board of Directors fired Ober and Gates amid allegations of misconduct in 1991. In 1993, WCB brought an action against North American Specialty Insurance Company to

recover on a fidelity bond for losses to the bank allegedly caused by the fraudulent conduct of Ober, Gates, and Attorney Kimball. The suit was brought in Massachusetts Superior Court and removed by the defendant to the United States District Court for the District of Massachusetts. As a part of discovery in that action, Ober, then living in Florida, was deposed under oath on March 10 and 11, 1994. Ober was asked, "Now, Mr. Kimball drew a realty trust entitled D, ampersand, E Realty Trust, D & E Realty Trust. Are you familiar with that?" He answered, "No." Ober was also asked, "Did you ever participate in the making of a loan where you had an undisclosed interest?" He again answered, "No."

**E.  Procedural History**

A federal grand jury issued a twenty-two count indictment against Kenrick and Ober on December 18, 1996. The indictment charged Kenrick with conspiracy, 18 U.S.C. § 371, bank bribery, 18 U.S.C. § 215(a), and three counts of bank fraud, 18 U.S.C. § 1344. It charged Ober with conspiracy, bank bribery, seventeen counts of bank fraud, and two counts of perjury, 18 U.S.C. § 1623. The case was tried to a jury from September 15 to October 27, 1997. The jury found Kenrick guilty on one count of bank fraud and Ober guilty on four counts of

-14-

bank fraud and one count of perjury.  They were acquitted on all other counts.  This appeal followed.

## II.  JURY INSTRUCTIONS ON BANK FRAUD

Kenrick and Ober argue that the district court erred by failing to instruct the jury that they could not be convicted of bank fraud unless they intended to harm WCB.[2]  Because they failed to raise this objection before the district court, we review for plain error.  See United States v. Robbio, 186 F.3d 37, 42 (1st Cir. 1999); Fed. R. Crim. P. 52(b).

The defendants were convicted of violating 18 U.S.C. § 1344, which provides:

> Whoever knowingly executes, or attempts to
> execute, a scheme or artifice--
> > (1)    to    defraud    a    financial
> > institution; or
> > (2) to obtain any of the moneys,
> > funds, credits, assets, securities,
> > or other property owned by, or under
> > the    custody    or    control    of,    a
> > financial    institution,    by    means    of

---

[2]This argument was raised more clearly before the panel by Kenrick than by Ober, but Ober has joined in it in his supplemental brief before the en banc court.  To the extent that Ober also makes a separate argument that the court erred by not requiring proof that the bank in fact lost money as a result of his conduct, he is clearly incorrect: section 1344 by its terms punishes not merely successful frauds, but any execution or attempted execution of a scheme to defraud a bank.  See Neder v. United States, 527 U.S. 1, 24-25 (1999) (noting that common-law element of damages "plainly ha[s] no place in the federal fraud statutes"); United States v. Blasini-Lluberas, 169 F.3d 57, 65 (1st Cir. 1999) ("The government need not prove actual loss as a result of the scheme . . . .").

> false or fraudulent pretenses, representations, or promises;
> shall be [subject to a specified maximum fine and term of imprisonment].[3]

The defendants object to a portion of the district court's instruction defining a "scheme to defraud":

> A scheme to defraud is ordinarily accompanied by a desire or a purpose to bring about some gain or benefit to one's self [sic] or some other person or by a desire or purpose to cause some loss to some other person. Here, there is not alleged--effectively, there hasn't been any evidence offered--that there was an intent to cause a loss to some other person. Here, we're dealing with allegations that there was to be some benefit to Mr. Ober, to Mr. Kenrick, or to people that Mr. Kenrick was concerned about.

The court also separately defined "intent to defraud": "To act with intent to defraud means to act wilfully with a specific intent to deceive or cheat or for the purpose of either causing some financial gain to another or one's self [sic]."

The panel that first considered this case agreed with the defendants that intent to defraud necessarily includes an "intent to harm" the bank, and that the district court erred by omitting this requirement from its jury instructions. The panel further held that there was no plain error. After further

---

[3]For the sake of convenience we will refer to this current version of § 1344, although the defendants were convicted under a previous version that was different in some ways not relevant here.

-16-

consideration of the intent issue, the en banc court, including the panel members, arrives at a different conclusion about the meaning of intent to defraud. We now hold, for the reasons set forth below, that the intent necessary for a bank fraud conviction is an intent to deceive the bank in order to obtain from it money or other property.

The panel addressed the intent question in the terms that the defendants posed it--whether evidence of an intent to deceive a bank and to enrich oneself or another person would support a bank fraud conviction without evidence of an intent to harm the bank. The panel's answer that proof of intent to harm was required was based on precedents from other circuits and an interpretation of the opinion of the Supreme Court in McNally v. United States, 483 U.S. 350 (1987), a case in which the Supreme Court held that the mail fraud statute does not reach "honest services" fraud.[4] By its terms, however, McNally does not require proof of "intent to harm" as an element of bank fraud, and there are no Supreme Court precedents that define the intent necessary for a bank fraud conviction. There is also no

_____

[4]In 1988 Congress overturned the holding of McNally by enacting 18 U.S.C. § 1346, which defines "'scheme or artifice to defraud' [to] include[] a scheme or artifice to deprive another of the intangible right of honest services." Section 1346 is inapplicable here because the allegedly fraudulent acts in this case took place before its effective date.

-17-

consensus among the circuits on the issue. Moreover, the "intent to harm" formulation of the panel contained an ambiguity that could not be dispelled easily.[5]

In arriving at our formulation of the intent necessary for a bank fraud conviction, we begin with the language of the bank fraud statute. Because neither the indictment nor the jury instructions specified the subsection of § 1344 under which Kenrick and Ober were charged, we must examine both subsections. Section 1344(2) specifies an intent requirement. It prescribes a punishment for "whoever knowingly executes, or attempts to execute, a scheme or artifice . . . to obtain any of the monies, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or

---

[5]In common usage, "intent to harm" may well be understood to mean a motive to cause the bank an ultimate financial loss. Of course, a court could explain to a jury that intent to harm had nothing to do with a motive to hurt a bank, and could explain further that the panel's broad definition of "intent to harm" included depriving a bank of the right to control its assets by depriving it of the information needed to make discretionary economic decisions. Nevertheless, a juror who failed to grasp the subtlety of the explanation might easily believe that a defendant could not be convicted of bank fraud unless his desire was to injure the bank rather than to enrich himself, and thereby mistakenly acquit a defendant who clearly had an intent to harm in the broad sense defined by the panel, i.e., frustrating the bank's right to control the disposition of its assets.

promises."[6] This language boils down to a prohibition on schemes to obtain money or other property from a bank by specified means of deception. The particular means of deception chosen are not essential to the intent element, which can therefore be defined as an intent to deceive a bank in order to obtain from it money or other property. Nothing in the language of § 1344(2) indicates that "intent to harm" is required.

The statutory text does not fully dispose of the intent question, however, because the specific language of § 1344(2) cannot dictate the intent element of the general "to defraud" language of § 1344(1). On the face of the statute, § 1344(2) provides an alternative to, not a definition of, a "scheme or artifice to defraud" in violation of § 1344(1). Nothing in the text of the statute requires that the intent element of § 1344(1) be defined in the same way as the intent element of § 1344(2) or, for that matter, that they be defined differently. Moreover, the Supreme Court said recently in <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 20 (1999), that "none of the fraud statutes defines the phrase 'scheme or artifice to defraud.'" Yet <u>Neder</u>

---

[6]As the Supreme Court explained in <u>McNally</u>, this language and the nearly identical language in the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, dates to a 1909 amendment to the mail fraud statute. The prohibition of a "scheme or artifice to defraud" dates to the original 1872 enactment of the mail fraud statutes. <u>See</u> <u>McNally</u>, 483 U.S. at 356-59.

-19-

provides clear guidance on how to discern the elements of the scheme to defraud proscribed in § 1344(1).

The Neder Court addressed the question of whether materiality is an element of a scheme to defraud under the mail, wire, and bank fraud statutes. Because the statutes do not define the elements of a scheme to defraud, the Court followed the "well-established rule of construction" that "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." Id. at 21, 23. The use of the word "defraud" raises a "presumption that Congress intended to incorporate the common-law meaning of the term 'fraud' in the mail fraud, wire fraud, and bank fraud statutes." Id. at 23 n.7. Since the statutory text does not rebut the presumption that Congress intended to incorporate the common-law materiality element, the Court held that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." Id. at 25.

Neder thus requires that we look to the common-law meaning of fraud in examining the intent element of a "scheme or artifice to defraud" in violation of § 1344(1). The intent element of common-law civil fraud is well established. According to the Restatement, which the Neder Court relied on for its definition of materiality, see 527 U.S. at 22 n.5

(quoting Restatement (Second) of Torts § 538 (1976)), "One who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit . . . ." Restatement (Second) of Torts § 525 (1976); see also W. Page Keeton et al., Prosser & Keeton on the Law of Torts, § 105, at 728 (5th ed. 1984) ("[a]n intention to induce the plaintiff to act or refrain from action in reliance upon the misrepresentation" is an element of tort of deceit). Commentary roughly contemporary with the Congress that enacted the mail fraud statute in 1872 gives a similar definition of the intent element. "It is said that a man is liable to an action for deceit if he makes a false representation to another, knowing it to be false, but intending that the other should believe and act upon it . . . ." Oliver Wendell Holmes, Jr., The Common Law 132 (1881); see also 2 Charles G. Addison, A Treatise on the Law of Torts § 1174, at 398 (H.G. Wood ed., 1881) ("[I]f a falsehood be knowingly told, with an intention that another person should believe it to be true, and act upon it, . . . the party telling the falsehood is responsible in damages in an action for deceit . . . .").

Common-law fraud thus requires an intent to induce action by the plaintiff in reliance on the defendant's

-21-

misrepresentation.  Commentators of the nineteenth and twentieth centuries agree that common-law fraud has no additional "intent to harm" requirement.  See Prosser, supra, § 107, at 741 (it is "well settled" that "intent to accomplish an ultimate purpose, as to benefit the speaker, or to cause harm to the one addressed," is "of no importance" except to punitive damages); 2 Addison, supra, § 1174, at 404 ("[I]t is not necessary to prove that the false representation was made from a corrupt motive of gain to the defendant, or a wicked motive of injury to the plaintiff . . . .").

        The common-law element of intent to induce action by the plaintiff in reliance on the defendant's misrepresentation translates directly into the criminal bank fraud context, where a guilty defendant intends to induce the bank to act--i.e., to part with money or other property--in reliance on his deceit or misrepresentation.[7]  Referring to an intent to induce reliance is potentially confusing to a jury, however, because it may erroneously suggest that actual reliance by the bank is also an element of the crime, as it is an element of common-law civil fraud.  The Supreme Court has said that the common-law elements

_____

    [7]The government proposes a similar formulation, stating in its supplemental brief that "a person cannot commit [bank fraud] without at least intending that his fraudulent scheme cause the bank to part with money or other property."

of justifiable reliance and damages "plainly have no place in the federal fraud statutes."  <u>Neder</u>, 527 U.S. at 25.  This potential for confusion is avoided by speaking simply of an intent to deceive the bank in order to obtain from it money or other property.  We see no substantive difference between an intent to induce a bank to part with money in reliance on deceit or misrepresentation and an intent to deceive a bank in order to obtain from it money or other property.

The latter formulation is consistent with the text of § 1344(2).  It is also similar to language we have used in several cases.  We have said, quoting an oft-cited Third Circuit case, that a bank fraud scheme must be "intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived."  <u>United States</u> v. <u>Brandon</u>, 17 F.3d 409, 424 (1st Cir. 1994) (quoting <u>United States</u> v. <u>Goldblatt</u>, 813 F.2d 619, 624 (3d Cir. 1987));[8] <u>accord</u> <u>United States</u> v. <u>Colon-Munoz</u>, 192 F.3d 210, 221 (1st Cir. 1999); <u>United States</u> v. <u>Blasini-Lluberas</u>, 169 F.3d 57, 65 (1st Cir. 1999).

--------

[8]Several other circuits have also quoted with approval the same language from <u>Goldblatt</u>, or its similar statement, 813 F.2d at 624, that "[t]he bank fraud statute condemns schemes designed to deceive in order to obtain something of value."  <u>See, e.g.,</u> <u>United States</u> v. <u>Dobbs</u>, 63 F.3d 391, 395 (5th Cir. 1995); <u>United States</u> v. <u>Britton</u>, 9 F.3d 708, 709 (8th Cir. 1993); <u>United States</u> v. <u>Hammen</u>, 977 F.2d 379, 383 (7th Cir. 1992); <u>United States</u> v. <u>Cloud</u>, 872 F.2d 846, 850 (9th Cir. 1989).

Furthermore, this formulation plainly comports with <u>McNally</u>'s requirement that a scheme to defraud be directed at "wronging one in his property rights by dishonest methods or schemes." 483 U.S. at 358. We hold, therefore, that the intent element of bank fraud under either subsection is an intent to deceive the bank in order to obtain from it money or other property.[9] "Intent to harm" is not required.

Applying our holding to the jury charge in this case, we conclude that the instructions read as a whole, <u>see</u> <u>United States</u> v. <u>Robbio</u>, 186 F.3d 37, 42 (1st Cir. 1999), adequately conveyed the essence of the intent element. The district court told the jurors that "[t]he term 'defraud' means to deprive another of something of value by means of deception or cheating." Given that instruction and the facts of this case, we are confident that the jury could not have found Kenrick and Ober guilty of bank fraud without finding that they intended to deceive WCB in order to obtain money from it. There was no plain error in the court's jury instructions.

We do not mean to imply, however, that the court's instruction or the pattern bank fraud instruction on which it was apparently based, <u>see</u> 1st Cir. Pattern Crim. Jury Instr.

---

[9]Of course, this element is not applicable in a case where the alleged fraud is the deprivation of the bank's honest services under 18 U.S.C. § 1346.

-24-

4.14, is perfect. Although it may "ordinarily accompan[y]" a scheme to defraud a bank, an ultimate "purpose of either causing some financial loss to another or bringing about some financial gain to oneself," id., is not the essence of fraudulent intent. What counts is whether the defendant intended to deceive the bank in order to obtain from it money or other property, regardless of the ultimate purpose.

### III. SUFFICIENCY OF THE EVIDENCE

Both defendants challenge the sufficiency of the evidence underlying their convictions. In reviewing this challenge, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Blasini, 169 F.3d at 62.

### A. Count 5 (Bank Fraud)

Ober was convicted of bank fraud on Count 5 for his involvement in the 222 Stackpole Street transaction. Kenrick was_acquitted on the same count. To convict a defendant of bank fraud, the government must prove that he "(1) engaged in a scheme or artifice to defraud, or made false statements or misrepresentations to obtain money from; (2) a . . . financial institution; and (3) did so knowingly." Brandon, 17 F.3d at

424. The scheme must involve material falsehood, see Neder, 525 U.S. at 25, and the defendant must have acted with an intent to defraud the bank, see Brandon, 17 F.3d at 425, which, as we have explained, is an intent to deceive the bank in order to obtain from it money or other property.

Viewing the record in the light most favorable to the government, there was ample evidence to convict Ober of bank fraud in connection with the 222 Stackpole Street transaction.[10] The jury could have found that Ober was Flynn's partner in purchasing 222 Stackpole Street;[11] that he concealed his interest by, inter alia, causing Flynn to submit a loan application to WCB that falsely listed her as sole owner; that WCB made a $900,000 loan to finance the purchase without approval of the Board of Directors; and that someone falsified the Board minutes

---

[10]In the midst of his argument that the evidence on Count 5 was insufficient, Ober contends that the district court erred in admitting allegedly unreliable WCB documents. To the limited extent that his evidentiary arguments are developed enough to permit review, it is clear from our review of the record that the district court did not abuse its discretion in admitting the challenged evidence. See United States v. Mitchell, 85 F.3d 800, 812 n.11 (1st Cir. 1996).

[11]Ober argues that if he had an interest in the Stackpole Street property it was unenforceable under the statute of frauds. Even if he is correct, his significant financial interest in the transaction was still a material fact that he had a duty to disclose; its unenforceability does not preclude his conviction. See United States v. Henderson, 19 F.3d 917, 922-23 (5th Cir. 1994).

to make it appear that the Board had approved the loan. Considering Ober's interest in the transaction and his position as WCB president, the jury could infer that he caused the loan to be made and either altered the Board minutes himself or caused them to be altered.

The jury could further have concluded that Ober intended to deceive WCB in order to obtain the Stackpole Street loan. Furthermore, although not necessary for conviction, as we discuss below in connection with Count 4, the jury could have found--based on the size of the loan, the location of the property outside WCB's usual lending area, the speculative nature of the condominium conversion, Flynn's lack of history of business with WCB, and the fact that Ober's interest in the loan violated Massachusetts banking law--that WCB would not have made the loan if all the material facts had been revealed. A rational jury could have found Ober guilty beyond a reasonable doubt on Count 5.[12]

_____

[12]We note that Ober's fraud was hardly novel. We have upheld the bank fraud convictions of bank insiders for making loans in which they had undisclosed interests. See United States v. Mangone, 105 F.3d 29, 31 (1st Cir. 1997) (credit union president); United States v. Smith, 46 F.3d 1223, 1226 (1st Cir. 1995) (credit union founder and general counsel). Other circuits have done the same. See, e.g., United States v. Hanson, 161 F.3d 896, 898 (5th Cir. 1998) (bank branch president); United States v. Harvard, 103 F.3d 412, 421 (5th Cir. 1997) (bank director); United States v. Henderson, 19 F.3d 917, 922-23 (5th Cir. 1994) (bank owner/board chairman); United

**B.  Count 4 (Bank Fraud)**

Ober and Kenrick were both found guilty of bank fraud in connection with the 8-10 Emerson Street transaction.  The government's allegation as to this transaction was essentially that it was a separate execution of the same scheme to defraud WCB charged in Count 5.[13]  The government alleged that Kenrick and Ober entered into a secret agreement whereby Kenrick would sell 222 Stackpole Street to Ober and Flynn, giving Ober the opportunity to make a large profit by converting the property to condominiums and Kenrick the chance to avoid the impending increase in the capital gains tax; in exchange, Ober would make financing available through WCB to Chung Lee and her parents to buy 8-10 Emerson Street, allowing Kenrick the same large tax advantage on that sale.

---

States v. Rackley, 986 F.2d 1357, 1361 (10th Cir. 1993) (bank president); United States v. Walker, 871 F.2d 1298, 1307 (6th Cir. 1989) (bank president).

[13]"Under the bank fraud statute, 18 U.S.C. § 1344, each execution of a scheme to defraud constitutes a separate indictable offense."  Brandon, 17 F.3d at 422.

The evidence, especially Chung Lee's testimony,[14] was sufficient to allow the jury to find that there was such a secret agreement.[15] Like the Stackpole Street mortgage, then, the Emerson Street mortgage was part of a scheme in which Ober deceptively took WCB's funds, and placed WCB at risk of loss, for his personal benefit. There were differences between the two executions of the scheme, of course. The benefit to Ober from Emerson Street was only indirect; he fraudulently obtained the money in the form of a loan to the Lees, not to himself, and he made no money from that transaction in isolation. The jury could have found, however, that he indirectly benefitted because the Emerson Street loan made possible the Stackpole Street purchase from which Ober garnered a substantial profit. The

---

[14]Kenrick argues on appeal that the jury could not rationally find the alleged agreement between him and Ober because Chung Lee's testimony was not credible. This argument is unavailing because "[c]redibility assessments are properly left to the jury." United States v. Woodward, 149 F.3d 46, 60 (1st Cir. 1998).

[15]A finding that this quid-pro-quo agreement existed is necessary to sustain the convictions on Count 4 because, the government's arguments to the contrary on appeal notwithstanding, its existence is the one material fact that the defendants allegedly concealed from WCB with respect to the Emerson Street transaction. The jury's verdict on Count 4 may therefore be logically inconsistent with its verdict on Counts 1, 2, and 3, finding both defendants not guilty of conspiracy and bank bribery. Inconsistency of this sort, however, does not affect our analysis of the sufficiency of the evidence on the counts for which the defendants were convicted. See United States v. Powell, 469 U.S. 57, 67-69 (1984).

-29-

Emerson Street mortgage was approved by the WCB Board of Directors, but Ober never disclosed to them the existence of the secret quid-pro-quo agreement. Both loans benefitted Ober while exposing WCB to potential loss. No actual pecuniary loss resulted directly from the Stackpole Street loan, but the bank lost $119,645.84 when the Lees defaulted on the Emerson Street loan.

On appeal, Kenrick and Ober attempt to shift the focus from their nondisclosure of the secret agreement onto the financial status of the Lees. They argue that the Lees were creditworthy borrowers who would have been granted a loan in any event, and that this fact precludes conviction on Count 4. At least two circuits have held, however, that the creditworthiness of the borrower is no defense to bank fraud when there is concealment of an insider interest in the transaction. See United States v. Doke, 171 F.3d 240, 245-46 (5th Cir. 1999); United States v. Holley, 23 F.3d 902, 909 (5th Cir. 1994); United States v. Walker, 871 F.2d 1298, 1307 (6th Cir. 1989).

Moreover, the defendants' argument misses the point in an important way. They mistake the character of the falsehood required for conviction by arguing, in effect, that it must have actually induced the bank to make a loan that would not otherwise have been made. On the contrary, to be criminally

fraudulent a defendant's deceptive course of conduct must be material, see Neder, 527 U.S. at 25, and it must be directed at obtaining money or other property from the bank, but there is no requirement that it actually cause the bank to change its behavior, see id. at 24-25 ("The common-law requirements of 'justifiable reliance' and 'damages[]' . . . plainly have no place in the federal fraud statutes."). A falsehood can be material[16] even if it did not in fact induce the bank to alter its conduct, although if such alteration did occur it is obviously probative of materiality. A misrepresentation about a borrower's creditworthiness can certainly be a material falsehood that supports a bank fraud conviction, but a different falsehood is also sufficient if it is material.

---

[16]According to the Supreme Court,

[A] matter is material if:

"(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

"(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."

Neder, 527 U.S. at 22 n.5 (quoting Restatement (Second) of Torts § 538 (1976)).

There was evidence that Kenrick and Ober had a secret quid-pro-quo agreement that gave Ober an indirect financial interest in the Emerson Street loan, and that Kenrick applied for the loan on the Lees' behalf and Ober approved it and presented it to the Board of Directors for ratification while concealing the material fact of that agreement. On the basis of that evidence, a rational jury could have found them both guilty beyond a reasonable doubt on Count 4.[17]

## C.  Counts 18 and 20 (Bank Fraud)

Ober was found guilty of two counts of bank fraud in connection with loans to the DGB Realty Trust, which Ober owned with Glenn Gates and William Upton.  Count 18 concerned WCB's $15,000 demand loan to DGB, which was increased to $25,000 in December 1987, was never disclosed to or ratified by the Board of Directors, and was succeeded by a loan in the name of Upton that had not been paid off at the time of trial.  Count 20

_____

[17]The jury might have thought that Kenrick stood in a somewhat different position from Ober.  Because he owed no fiduciary duty to WCB and had no power to cause it to make the loan, it could perhaps be argued that he did not himself execute the scheme to defraud.  The bank fraud charge against Kenrick, however, was alternatively premised on an aiding and abetting theory.  See 18 U.S.C. § 2.  Even if Kenrick did not execute the scheme, there was sufficient evidence that he "associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed," United States v. Colon-Munoz, 192 F.3d 210, 223 (1st Cir. 1999), to find him guilty of aiding and abetting Ober's fraud.

-32-

concerned Ober's practice of having DGB checks paid, even though there were insufficient funds in the DGB checking account, and held for long periods until there was enough money in the account to cover them--thus essentially providing Ober and his partners with undisclosed interest-free loans. The indictment alleged, and the evidence showed, that one check in the amount of $6,780.42 was thus held for over nine months. The evidence was sufficient to find Ober guilty on both counts. Ober concealed from the Board the plainly material fact that he was putting bank assets in his own pocket by means of undisclosed loans that put the bank at significant risk of loss and that were eventually repaid either incompletely or without interest. In short, the evidence on these counts, like the evidence on Counts 4 and 5, suggested that Ober treated WCB as his personal piggy bank, the assets of which he felt free to dispose of by loans to himself, his associates, or their designees. On that basis a rational jury could have found Ober guilty of bank fraud as we have defined it above.

## D.  Count 22 (Perjury)

Ober was convicted of perjury for denying, under oath, that he was familiar with the D & E Realty Trust and that he had ever participated in making a loan in which he had an undisclosed interest. As recounted above, there was evidence

that Ober was present when the D & E Realty Trust was executed, owned a half interest in it, and received half of its net income. There was also evidence that he participated in making undisclosed loans to the Riverview Development Trust and the DGB Realty Trust while having an interest in each trust. On the basis of that evidence, the jury could have concluded that both of Ober's statements--which he stipulated were material--were false and that he made them willfully. See United States v. Cardales, 168 F.3d 548, 558 (1st Cir.), cert. denied, 120 S. Ct. 101 (1999) (elements of perjury are "falsity, materiality, and willfulness"). Although Ober now argues that the question whether he was "familiar with" the D & E Realty Trust was ambiguous, there was sufficient evidence to prove that his denial was false on any reasonable interpretation of the question.

## IV. OBER'S DUE PROCESS CLAIMS

Ober raises two additional arguments, neither of which merits extended discussion. He contends first that he was denied due process as a result of the government's alleged delay in seeking an indictment on the bank fraud charges for approximately three years after its investigation was completed. To succeed on such a claim, a defendant must demonstrate "that the preindictment delay caused him actual, substantial prejudice

-34-

[and] that the prosecution orchestrated the delay to gain a tactical advantage over him." United States v. Stokes, 124 F.3d 39, 47 (1st Cir. 1997) (citing United States v. Marion, 404 U.S. 307, 324 (1971)). Ober can show neither; instead, he offers only "mere speculation and bare allegations," which are clearly insufficient to make out a due process violation. United States v. McCoy, 977 F.2d 706, 711 (1st Cir. 1992).

Ober also argues that the district court violated his due process rights by preventing him from recross-examining an expert witness, appraiser Calvin Hastings, called by Kenrick to testify to the value of 222 Stackpole Street. The court barred Kenrick from conducting a redirect examination of Hastings as a sanction for Kenrick's failure--which was not discovered until the government's cross-examination--to disclose Hastings's report to the government. The court permitted Ober's attorney, who had already cross-examined Hastings, to begin recross, with instructions that it be limited to the scope of the government's cross-examination. When Ober's attorney began by asking Hastings whether he had expected he would be cross-examined on the report, the court interrupted him, stopped the examination, and excused the witness. Ober neither objected nor made an offer of proof.

The district court has "extensive discretion" in controlling recross-examination. United States v. Sorrentino, 726 F.2d 876, 885 (1st Cir. 1984). Here the court stopped the recross because it concluded that Ober's attorney did not intend to re-examine Hastings on matters within the scope of the government's cross, but instead to conduct, in effect, the redirect that Kenrick's counsel could not. This is exactly the sort of judgment call that we should not second-guess. Considering that Ober had already had an opportunity to cross-examine Hastings, the court's limitation of his recross-examination was not an abuse of its extensive discretion, let alone a due process violation.

**Affirmed.**