# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3617

_____

United States of America,

        Appellee,

   v.

Herman Staples,

        Appellant.

 

_____

No. 03-3994

_____

United States of America,

        Appellee,

   v.

Michael Washington,

        Appellant.

Appeals from the United States
District Court for the
Eastern District of Missouri.

_____

No. 03-4021

_____

United States of America,   *
           *
    Appellee,    *
           *
   v.        *
           *
John Montgomery,    *
           *
    Appellant.   *
           *

_____

No. 03-4023

_____

United States of America,   *
           *
    Appellee,    *
           *
   v.        *
           *
Evelyn Silinzy,     *
           *
    Appellant.   *

_____

Submitted: April 11, 2005
Filed: January 23, 2006

_____

Before COLLOTON, McMILLIAN,[1] and BENTON, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Herman Staples, Michael Washington, John Montgomery, and Evelyn Silinzy were convicted of bank fraud charges. Washington appeals his sentence, and the others challenge their convictions and sentences. We affirm with respect to Staples and Washington, but reverse the convictions of Montgomery and Silinzy.

I.

The appellants were charged, along with seven other people, in a multi-count indictment alleging various counts of bank fraud. The overall scheme, in which different defendants participated to varying degrees, involved obtaining legitimate cashier's checks and altering the face amounts so that they appeared to be worth far more than the amount for which they had been purchased. The altered checks were then passed to title insurance companies in connection with real estate transactions involving inflated land prices, where the "buyer" and "seller" of the properties were actually participants in the scheme. As part of the real estate closings, the title insurance companies would deposit into their bank accounts the altered checks that were received from the buyers as payment for the properties, and then issue their own legitimate checks to the sellers for the inflated prices. The sellers would then negotiate these legitimate checks from the title companies and distribute part of the proceeds to some of their confederates. When it was discovered that the cashier's checks were altered, and that the face amount was not collectible, the title company

_____

[1]The Honorable Theodore McMillian died on January 18, 2006. This opinion is filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E.

would suffer a loss from having paid the sellers an inflated amount based on the altered cashier's checks.

Prior to trial, Washington and Staples pled guilty to aiding and abetting bank fraud and attempted bank fraud, respectively. Montgomery and Silinzy proceeded to trial, and we set forth the allegations against them in greater detail.

The indictment alleged, *inter alia*, that on October 29, 2001, a man identifying himself as Antonio Hutti purchased a cashier's check in the amount of $20 from Gateway National Bank. The same man purchased a similar check on November 5, 2001. On November 16, 2001, John Montgomery sold two residences to the man identified as Hutti, one for $62,300 and one for $40,500. At trial, a real estate appraiser opined that the properties were worth only a total of $14,500. The man identified as Hutti presented the two Gateway National Bank cashier's checks, originally for $20 but now altered so that they appeared to be in the amounts of the sale prices of the properties, to Archway Title Company. Archway Title deposited the checks into its accounts at Montgomery First National Bank and Allegiant Bank, respectively, and then issued to John Montgomery a number of checks totaling the sale prices of the residences, drawn on the Archway Title accounts at Montgomery First National Bank and Allegiant Bank.

Montgomery used some of the checks, including several checks drawn on Archway Title's account with Montgomery First National Bank and a single check drawn on Archway Title's account at Allegiant Bank, to purchase additional checks from Montgomery First National Bank, payable to various payees including himself. Montgomery also received cash in two of those transactions. Montgomery cashed the other checks he received from Archway Title at another bank.

-4-

Montgomery was convicted after trial on one count of aiding and abetting bank fraud against Montgomery First National Bank for negotiating at that bank the checks drawn on the Archway Title account at that bank, and on another count of aiding and abetting bank fraud against Montgomery First National Bank for negotiating at that bank the check drawn on Archway Title's account at Allegiant Bank. Montgomery was acquitted on a third count of aiding and abetting bank fraud.

The indictment charged Silinzy with bank fraud in connection with her sale of a property for $392,000. Rebecca Robinson, posing as "Sharon Woods," gave Phoenix Title Company four altered U.S. Bank cashier's checks totaling $98,045.84 (initially the checks had a face value of $20 apiece). Phoenix Title deposited the checks into its account at First Bank, in St. Charles, Missouri, and shortly thereafter, as part of the closing, issued a check on its account in the amount of $51,250 payable to Dolly Mae Morris, to pay off a promissory note associated with the property. According to the government's summary witness, Silinzy said that Phoenix Title told her about the promissory note, and although she did not know Dolly Mae Morris, she never raised any questions about the legitimacy of the promissory note. Judy Wilson, a codefendant posing as Dolly Mae Morris, converted the $51,250 check into three bank checks. Ultimately, the entire amount was converted to cash and divided among Wilson, Silinzy, Washington, and others. Silinzy was convicted of one count of aiding and abetting bank fraud for her part in causing Phoenix Title to create the check to Dolly Mae Morris drawn on its First Bank account. Silinzy was acquitted of a second count of aiding and abetting bank fraud.

## II.

Staples argues that the district court erred when it failed to rule in a timely manner on his motions to quash the indictment and for a copy of the minutes of grand jury proceedings. A valid guilty plea, however, "operates as a waiver of all non-

jurisdictional defects or errors," *United States v. Vaughan*, 13 F.3d 1186, 1188 (8th Cir. 1994) (internal quotation omitted), and because Staples pled guilty, he is precluded from raising these issues on appeal.

Staples also argues that the trial court abused its discretion by placing him on supervised release for three years when, because he was taken into custody prior to sentencing, he already had served his seven-month prison sentence prior to the sentencing date. According to Staples, he had paid his debt to society by completing the entire term of imprisonment, and thus "[t]he effect of placing him on supervised release for three years and subjecting him to three years' incarceration if he violated the conditions of probation is an unjust result, which impedes his right to liberty and justice without government interference." (Appellant's Br. at 10).

Because Staples did not object to the three-year term of supervised release, we review the sentence for plain error. *United States v. Olano*, 507 U.S. 725, 731 (1993). In his plea agreement, Staples acknowledged that he understood that the district court may impose a term of supervised release to follow any term of incarceration, and that the period of supervised release could be "not more than five years." Staples asserts that despite the written plea agreement, the "understanding" of the parties was that supervised release would not apply under the circumstances of his case. He points to no evidence in support of that position, and his position is contrary to paragraphs of the presentence report to which Staples made no objection. A term of supervised release of up to five years is authorized by statute, 18 U.S.C. § 3583(b)(1), and the term of three years imposed by the district court is consistent with the sentencing guidelines, USSG § 5D1.1(a). Staples's contention that his early incarceration somehow excuses him from a term of supervised release is therefore without merit.

III.

Washington appeals his sentence, arguing that he was erroneously sentenced under the mandatory sentencing guidelines that prevailed prior to *United States v. Booker*, 125 S. Ct. 738 (2005). Washington pled guilty to aiding and abetting bank fraud, in violation of 18 U.S.C. § 2 and §§ 1344(1) and (2). In his plea agreement, Washington stipulated to a base offense level of six, USSG § 2B1.1(a)(2), with a sixteen-level increase for the amount of loss, *id*. § 2B1.1(b)(1)(I), a three-level adjustment for aggravating role in the offense, *id*. § 3B1.1(b), and a three-level reduction for acceptance of responsibility, *id*. § 3E1.1(b).

The district court, however, determined that the guidelines applied differently than suggested in the plea agreement. In addition to the base offense level and the increase for amount of loss, the court increased Washington's offense level by two levels under § 2B1.1(b)(9)(A) for production and/or trafficking of an unauthorized counterfeit access device. The court also assessed a four-level increase for aggravating role in the offense, finding that Washington was an organizer or leader, not merely a manager or supervisor as he had stipulated. *See* USSG § 3B1.1(a). The court next found that Washington should receive a two-level adjustment for obstruction of justice, pursuant to USSG § 3C1.1, and that he was thus ineligible for an acceptance-of-responsibility reduction. *See* USSG § 3E1.1, comment. (n.4). In light of these findings, the district court calculated a total offense level of thirty. Washington's offense level and his criminal history, which placed him in category III, produced a guideline range of 121 to 151 months' imprisonment. The district court imposed a term of 144 months.

Washington's sole argument on appeal is that his sentence is unconstitutional because the district court applied the sentencing guidelines in a mandatory fashion, and increased his offense level based on facts neither charged in the indictment nor

admitted by him. Because he raises the *Booker* issue for the first time on appeal, Washington concedes that we should review for plain error. *See United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005) (en banc).

We conclude that although there was plain error in applying the mandatory guidelines, Washington cannot show that the error affected his substantial rights, *i.e.*, that there is a reasonable probability that but for the error, the district court would have imposed a more favorable sentence. *Id.* at 553. The district court sentenced Washington near the top of the applicable sentencing range, explaining that Washington's "extensive involvement in this was very serious, and the fact that people [he] organized and led were people who had – many of those people, and I just use Rebecca Robinson as an example, yeah, she was an addict, and [he] took advantage of her need and her weakness to use her in this case, and there are many others like that." (S. Tr. at 183-84). The district court explained that "I picked that point in the guidelines because I think it recognizes the seriousness of your offense," and added that it was toward the top of the range because, had the district court found one more victim, the sentencing range would have increased to 151 to 188 months. We have said that a *Booker* error is harmless where the district court "left unused some of its discretion" that would have permitted a more favorable sentence under even the mandatory regime, *United States v. Perez-Ramirez*, 415 F.3d 876, 878 (8th Cir. 2005), and it follows *a fortiori* that Washington cannot meet the standard for demonstrating plain error where the court did not deem it appropriate to sentence him at the lower end of the applicable mandatory guideline range.

IV.

The appeals of Montgomery and Silinzy raise difficult issues concerning the scope of the bank fraud statute. The circuits are divided in their approaches to the statute, and this case is complicated further by the manner in which the district court

(at the government's suggestion) instructed the jury. We ultimately conclude that given the law of the case as the elements were defined for the jury, there is insufficient evidence to sustain the bank fraud convictions against Montgomery and Silinzy.

The bank fraud statute, 18 U.S.C. § 1344, makes it a crime to execute or attempt to execute

a scheme or artifice –

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises . . . .

We have read the statute to provide two distinct ways in which a person can commit bank fraud. *See United States v. Ponec*, 163 F.3d 486, 488 (8th Cir. 1998). Nonetheless, for reasons that are not explained, the government's proposed jury instructions for both Montgomery and Silinzy suggested that the jury be instructed in the conjunctive – that is, for the defendant to be found guilty, the evidence must show that the defendant engaged in a scheme or artifice to defraud a financial institution *and* to obtain monies, funds, credits, and assets of the institution. (Gov't Proposed Instructions, filed Aug. 18, 2003, tenth unnumbered instruction) (emphasis added).[2] The district court, without objection, adopted the government's proposal and defined the first element of bank fraud to require that "the defendant did aid and abet the

_____

[2]The government's proposed instruction cites Eighth Circuit Pattern Jury Instruction 3.09, which concerns "elements of offense" and "burden of proof," without regard to a specific substantive statute.

execution of a scheme and artifice to defraud a financial institution, alleged in the particular count *and* to obtain monies, funds, credits and assets owned by and under the custody of that institution by means of materially false and fraudulent pretenses, representations, and promises." (Instruction No. 16, filed Sept. 4, 2003) (emphasis added). This instruction thus required the jury to find that the defendant violated both subsection 1344(1) and 1344(2). Furthermore, to find a violation of 1344(2), the instruction advised the jury that it must find that the defendant's scheme was designed to obtain monies that were owned by *and* under the custody of the financialinstitution, rather than monies that were owned by *or* under the institution's custody.[3]

The government, therefore, assumed a burden to prove more than the statute required. Where the instructions to the jury include elements that are not dictated by statute, the instructions nonetheless become the law of the case. *United States v. Ausler*, 395 F.3d 918, 920 (8th Cir. 2005); *United States v. Tapio*, 634 F.2d 1092, 1094 (8th Cir. 1980) (per curiam). In considering a challenge to the sufficiency of the evidence under those circumstances, we must consider whether the evidence was sufficient to meet the elements as defined for the jury. *Id.*

Several circuits have held that the bank fraud statute does not extend to situations where the defendant has no intent to expose the bank to an actual or potential loss, *see United States v. Thomas*, 315 F.3d 190, 200 (3d Cir. 2002); *United States v. Laljie*, 184 F.3d 180, 189 (2d Cir. 1999); *United States v. Rodriguez*, 140 F.3d 163, 167 (2d Cir. 1998), or does not place the bank at risk of civil liability.

---

[3]The Eighth Circuit pattern instruction on bank fraud lists subsections (1) and (2) of section 1344 as bracketed alternatives, and it lists ownership or custody of monies as bracketed alternatives within the alternative for subsection 1344(2). Eighth Circuit Pattern Jury Instruction 6.18.1344 (2005). The pattern instructions of other circuits for § 1344(2) refer to monies owned by *or* under the custody and control of a financial institution. *E.g.*, Seventh Circuit Federal Jury Instructions: Criminal, at 266 (1999); Sixth Circuit Pattern Criminal Jury Instructions § 10.03 (2005).

*United States v. Odiodio*, 244 F.3d 398, 401 (5th Cir. 2001); *United States v. Sprick*, 233 F.3d 845, 852 (5th Cir. 2000); *United States v. Davis*, 989 F.2d 244, 246-57 (7th Cir. 1993). For example, a "scheme to pass bad checks," and a "pigeon drop" scheme, in which a victim is induced to withdraw money from a bank and entrust it to the defendant, have been held insufficient to establish bank fraud. *Laljie*, 184 F.3d at 190. The reasoning of these courts is typified by the statement of the Seventh Circuit that the purpose of the bank fraud statute "is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of financial institutions." *Davis*, 989 F.2d at 247; *see also Thomas*, 315 F.3d at 199 ("Money is taken from banks every day for countless foolish purposes, but in such instances, banks are not exposed to liability nor is their integrity compromised.").

Other circuits, however, have rejected the requirement of an intent to harm or create a risk of loss to a financial institution, and have upheld convictions in the absence of any such intent. *See United States v. McNeil*, 320 F.3d 1034, 1038 (9th Cir. 2003); *United States v. De la Mata*, 266 F.3d 1275, 1298 (11th Cir. 2001); *United States v. Kenrick*, 221 F.3d 19, 27 (1st Cir. 2000) (en banc); *United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995). Some of these courts have required the government at least to prove that the defendant intended to deceive the bank, *Kenrick*, 221 F.3d at 29; *De la Mata*, 266 F.3d at 1298, although one circuit has gone so far as to say that there is a violation of § 1344(2) if the defendant merely intends to defraud *someone*, and then causes a bank, as an unwitting instrumentality, to transfer funds pursuant to a fraudulent scheme. *United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001).

For our part, we have treated the two subsections of the bank fraud statute differently, on the view that "[o]therwise, there seems to be no reason for Congress to have set out two separate ways in which bank fraud could be committed under this statute." *Ponec*, 163 F.3d at 488. Subsection (2), we concluded, appears to require "some loss to the institution, or at least an attempt to cause a loss." *Id*. As for subsection (1), we have held that no actual loss or intent to cause a loss is required,

so long as the defendant has "defraud[ed]" a financial institution. *Id*.; *United States v. Whitehead*, 176 F.3d 1030, 1041 (8th Cir. 1999). Even then, however, we granted that the government must prove that the defendant "deliberately made false representations to the bank," because "[o]therwise, there would be no scheme or artifice to defraud." *Ponec*, 163 F.3d at 489. In other words, *Ponec* indicates agreement with those circuits that have said there must be a scheme or artifice to defraud *the bank* to find a violation of subsection (1). *See Kenrick*, 221 F.3d at 29 ("[T]he intent element of bank fraud under either subsection is an intent to deceive the bank in order to obtain from it money or other property.").

Because this case was charged to the jury in the conjunctive, and, accordingly, the evidence must be sufficient, under the law of the case, to prove the elements of both § 1344(1) and (2), we do not think the convictions of Montgomery and Silinzy can be sustained. The government concedes that the entire loss caused by the fraudulent conduct was suffered by the title companies, and that the banks involved in the counts of conviction were merely instrumentalities used to cash legitimate checks written by the title companies. Under our court's view of § 1344(2), the evidence is therefore insufficient, because there was no loss, or attempt to cause a loss, to a financial institution. *Ponec*, 163 F.3d at 488.

It seems doubtful that Montgomery could be convicted under subsection (1) either, because there was no evidence that he intended to defraud the banks on whose accounts Archway Title wrote legitimate checks, and Montgomery's presentation of the legitimate checks to the banks does not constitute a false representation. *See Williams v. United States*, 458 U.S. 279, 284 (1982). The case under § 1344(1) is stronger with respect to Silinzy, because one of her confederates falsely represented herself to the bank as Dolly Mae Morris in order to cash the legitimate check. The government, however, assumed the burden of proving a violation of both subsections (1) and (2), and for the reasons discussed, the evidence in insufficient as to § 1344(2). We note, moreover, that the court (at the government's suggestion) also instructed the

-12-

jury with respect to § 1344(2) that it must find that each defendant schemed to obtain monies that were owned by *and* under the custody or control of a bank, (Instruction No. 16; Proposed Instructions, tenth unnumbered instruction), and we see no evidence that the banks *owned* the funds at issue. This is yet another shortcoming in the evidence under the unusual law of the case developed in the district court.

\* \* \*

For the foregoing reasons, we affirm the judgments of the district court as to Washington and Staples, but reverse and vacate the judgments as to Montgomery and Silinzy.

_____