**BRADFORD TRUST COMPANY OF BOSTON, Plaintiff-Appellant, Cross-Appellee,**

v.

**TEXAS AMERICAN BANK—HOUSTON, Defendant-Appellee, Cross-Appellant.**

No. 85–2139.

United States Court of Appeals, Fifth Circuit.

May 23, 1986.

Fletcher Etheridge, Houston, Tex., Joseph A. Kilbourn, New York City, for plaintiff-appellant, cross-appellee.

Berry D. Bowen, Houston, Tex., Hal S. Scott, Cambridge, Mass., F.B. Davis, Andrews & Kurth, Houston, Tex., for defendant-appellee, cross-appellant.

Before GEE, RUBIN and DAVIS, Circuit Judges.

**OPINION**

W. EUGENE DAVIS, Circuit Judge:

This diversity case presents the question of who should bear the loss flowing from a fraudulently induced $800,000 wire transfer. We must choose between the institution that honored the forged order of its customer to wire funds and the bank to whom the funds were wired which did not credit the account as directed. On cross-motions for summary judgment the district court applied the Texas comparative negli-

gence statute, Tex.Rev.Civ.Stat.Ann. art. 2212a (Vernon Supp.1985),[1] and apportioned the loss equally between the two parties. Both parties appeal and argue that the other party should bear the entire loss. We decline to apply comparative negligence principles and reverse the judgment of the district court. We conclude that the initial bank that honored the forged order must bear the entire loss.

## I.

In an ingenious scheme, two con artists, using aliases of Hank and Dave Friedman, arranged to buy rare coins and gold bullion from Colonial Coins, Inc. (Colonial) in Houston for $800,000. The imposters informed Colonial that they would wire funds from their bank in Boston to Colonial's account at Texas American Bank—Houston N.A. (Texas American)[2] to pay for the coins. Colonial agreed and gave the Friedmans its account number at Texas American.

The imposters next sent a forged letter and stock power to Bradford Trust Company (Bradford), the agent for a mutual fund, directing the liquidation of $800,000 from the mutual fund account of Frank Rochefort. The forged order also instructed Bradford to wire the $800,000 from this account to Colonial's account in Texas American in Houston. Bradford, without following internal procedures recently instituted because of a similar scam,[3] ordered its correspondent bank, State Street Bank of Boston (State Street) to wire the funds to Texas American. The text of the transfer included the number of Colonial's account at Texas American, but stated that it was for the account of Frank S. Rochefort.[4]

When the funds were received, Texas American notified Colonial that the funds had been deposited into Colonial's account. With this assurance, Colonial released the coins to the imposters.

Bradford became aware of the scam when an astonished Rochefort received notice of the withdrawal and informed Bradford that he had not authorized it. Bradford reinstated Rochefort's account and demanded that Texas American and Colonial reimburse it. Texas American and Colonial refused and this lawsuit followed. Bradford compromised its claim against Colonial, which was dismissed from the litigation. The district court, on summary judgment, applied the Texas comparative negligence statute and divided the loss equally between Bradford and Texas American. Bradford appeals, contending that Texas American should bear the entire loss because its negligence in failing to follow Bradford's order to deposit the funds in Rochefort's account was the primary cause of the loss. Texas American cross-appeals, arguing that Bradford should suffer the entire loss because Bradford dealt with the imposter, honored the forged order to pay and hence was in the best position to prevent the loss.

## II.

### A.

The district court, having no well-defined body of law that clearly applied to resolve the dispute in this case, relied on the Texas comparative negligence statute as authority to divide the damages between the par-

1. The Texas comparative negligence statute in effect at the time of this incident, Art. 2212a, was repealed by Section 1 of Acts 1985, 69th Leg. Ch. 959 and a substantially identical version enacted as § 33.001 of the Civil Practice and Remedies Code.

2. This bank changed its name from Southern National Bank—Houston to Texas American Bank after this incident. We will refer to it throughout this opinion as Texas American.

3. In April of 1980, Bradford was the victim of a similar fraudulent scheme. As a result, new security procedures were instituted. For transactions over $100,000, the new procedures required thorough review of the documents, shareholder confirmation when the shareholder instructed Bradford to wire the money to a person or to an address other than that on record, and approval by senior management.

4. The wire transfer stated: "State Street Bos/Michealpiemont MCMT 5207 X 6386 Southern Hou/A/O/Frank S. Rochnefort, Jr. Acct. * 057 141." (Note that Rochefort was misspelled.)

ties. The district court cited as authority *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), which applied comparative negligence principles to a strict products liability case.

Although we feel the same equitable tug the district court undoubtedly felt to apply comparative negligence principles, we are persuaded that it would be a mistake to do so in this commercial case.

The comparative negligence statute expressly extends to actions "to recover damages for negligence resulting in *death or injury to persons or property....*" Art. 2212a, *supra.* This language clearly extends comparative negligence principles to cases of physical harm to persons and property; whether this statute was intended to apply to other types of damage is doubtful. Although it is not inconceivable that a Texas court would interpret property broadly enough to include a loss such as that at issue here, we are persuaded that a federal diversity court should not adopt such a questionable interpretation. This is particularly true where, as here, neither party to the appeal urges us to apply comparative negligence principles.

We are also influenced by our recognition that in commercial disputes between seasoned bankers and other businessmen, certainty of result is more important than in traditional tort litigation. In commercial relationships known risks can be priced or shifted to others; if disputes arise, a bright line rule results in faster, easier settlements. The principal reason for a comparative negligence rule in physical harm cases—avoiding the harsh distributional results of precluding the recovery of the slightly negligent plaintiff who has suffered a devastating loss—has considerably less force in the commercial banking world. Prosser and Keeton on The Law of Torts, § 67, p. 469 (5th ed. 1984).

### B.

Having decided that the Texas comparative negligence statute does not apply to this case, we widen our search for Texas law that does apply. Unfortunately, we have found no direct authority that resolves the question. Neither the Electronic Fund Transfer Act, 15 U.S.C. § 1693a(6)(B), nor the Uniform Commercial Code apply. *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047 (2d Cir.1979); *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951 (7th Cir.), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (1982). Other courts faced with resolving controversies relating to wire transfers have applied the UCC by analogy. *Delbrueck, supra*, at 1051; *Securities Fund Services v. American National Bank and Trust Co.*, 542 F.Supp. 323 (N.D.Ill.1982). Because of the close analogy between allocation of fraud losses in negotiable instruments and wire transfers we look to both Texas court decisions before Texas adopted the UCC and the UCC for guidance. Two factors emerge from these sources that are helpful in analyzing the question of who should bear the loss in this case: 1) which party was in the best position to avoid the loss; and 2) which solution promotes the policy of finality in commercial transactions?

The first factor, which party is in the best position to avoid the loss, is a principal reason underlying a number of loss allocation calls in the UCC. For example, it provides the essential reason for requiring the drawee bank to bear the loss if it pays on the drawer's forged signature. Tex. Bus. & Com.Code Ann. § 3.404 (Vernon 1968); *Greenville Avenue State Bank v. Lang*, 421 S.W.2d 748 (Tex.Civ.App.1967). This is because the bank, which can verify its customer's signature, is in the best position to discover the forgery and avoid the loss. Similarly, if an endorsement on an instrument is forged, the loss is ordinarily placed on the party in the collection chain who accepted the instrument from the forger. Tex.Bus. & Com.Code Ann. § 3.417(a)(1) (Vernon 1968) and comment 3. Again, the UCC recognizes that the party dealing directly with the forger has an opportunity to verify the endorser's identity and is in the best position to avoid the loss. Indeed, the common thread running through the imposter cases is to "throw the

loss resulting from dealing with an imposter on the person who dealt with the imposter, and presumably, had the best opportunity to take precautions that would have detected the fraud, rather than on a subsequent holder, who had no similar opportunity." *Fair Park National Bank v. Southwestern Investment Co.,* 541 S.W.2d 266, 269–70 (Tex.Civ.App.1976).

Bradford dealt directly with the imposter. It received the forged order directing the liquidation of Rochefort's account. If Bradford had followed procedures it had in place that called for verification of the customer's order, the loss would not have occurred. Instead of following those procedures and verifying Rochefort's order, Bradford set the fraudulent scheme into motion by liquidating Rochefort's account and wiring the funds to Texas American. Although Texas American should have recognized the discrepancy between the account number and the name of the owner of the account to whom the wire directed the funds be credited, we are persuaded that Texas American's fault was secondary to that of Bradford's. It is far from certain that the loss would have been prevented even if Texas American had noticed the discrepancy between the account number and the holder of the account and had called this discrepancy to Bradford's attention. To conclude that this action by Texas American would have avoided the loss requires us to assume that such a call to Bradford would have caused Bradford to contact Rochefort and verify his order. On the other hand, it is certain that if Bradford had called Rochefort to verify his purported order to transfer funds to Colonial this scheme would have been discovered and no loss would have been suffered.

Two wire transfer cases decided by Texas courts before the adoption of the UCC follow this same reasoning. In *Western Union Telegraph Co. v. American State Bank,* 277 S.W. 226 (Tex.Civ.App.1925), an individual who identified himself as Joe Spinks, deposited two checks in American State Bank. Before the bank learned that the checks were bogus, it received a telegram from Joe Spinks requesting the bank to wire him $650. The bank instructed Western Union to wire the money to Spinks. When the bank discovered Spinks was an imposter, it sued Western Union to recover the money. The Texas Court of Appeals in reversing a judgment entered by the district court in favor of the bank stated that: "[t]he duty devolves on the Bank to identify its customers, and when they accepted the unknown as Joe Spinks, they laid the groundwork for subsequent trouble." 277 S.W. at 227. In *Western Union Telegraph Co. v. Cosby,* 99 S.W.2d 662 (Tex.Civ.App.1936), an imposter representing himself as Cosby, a business partner of Langlois, called Langlois and asked Langlois to wire him $400. Langlois, thinking it really was Cosby, ordered Western Union to send him the money. Cosby then sued Western Union to recover the money once he discovered the error. The court of appeals again reversed the district court's judgment against Western Union stating that, "where two innocent parties have been deceived, the loss must be borne by the one who primarily made such loss possible." 99 S.W.2d at 664.

For the reasons set forth above, we are persuaded that Bradford, by honoring the forged order to transmit Rochefort's funds after dealing directly with the imposter, was in the best position to avoid the loss.

We have also considered how our allocation of the loss in this case squares with the desired policy of finality in commercial transactions. The UCC in section 3.418 adopted the principle established in the time honored decision of *Price v. Neal,* 3 Burr. 1355 (1762) in which the court held that a drawee who accepts or pays an instrument on the forged signature of the drawer is bound on his acceptance and cannot recover back his payment. Section 3.418 provides in part: "... *payment or acceptance of any instrument is final* in favor of a holder in due course or a person who has in good faith changed his position in reliance on the payment." Tex.Bus. & Com.Code art. 3.418 (Vernon 1968) (emphasis added) The reporters in the official comments to this section give two justifica-

tions for adopting this rule: "The traditional justification for the result is that the drawee is in a superior position to detect a forgery because he has the maker's signature and is expected to know and compare it; a less fictional rationalization is that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered." *Id.* at comment 1.

In *Perini Corporation v. First National Bank of Habersham County*, 553 F.2d 398 (5th Cir.1977), we considered who should bear the loss as between the drawee bank that paid on forged signatures of the drawer and the depository bank which accepted the instruments without proper endorsements. In deciding this Georgia diversity case, we resolved conflicting UCC rules by relying primarily on the finality policy and concluded that the drawee bank must bear the entire loss.[5]

Assessing the loss in this case to Bradford and ending the transaction when Bradford paid under Rochefort's forged order rather than inquiring into and upsetting later transactions after the forgery was discovered clearly serves this bedrock policy of finality.

## C.

█ Bradford urges us to find that Texas American's failure to follow Bradford's instructions in the wire transfer was the primary, overriding cause of the loss. Bradford argues that its earlier negligence in accepting the forged order of Rochefort to pay would have been inconsequential had Texas American handled the transfer with due care and in accordance with ordinary standards and practices of the banking industry. We agree with Bradford that Texas American was negligent in failing to notice the discrepancy between the account number and the name of the owner of the account to which the funds were to be credited. Even if allocation of the loss

depended entirely upon a determination of which party was more at fault, however, this would not alter our decision to lay the loss at Bradford's feet. We are persuaded that Bradford's act in honoring the forged authorization without following its own internal procedures to verify the genuineness of the request was the primary cause of the loss. The fault of Texas American failing to note the discrepancy between the account number and the name of the owner of the account to whom the money was to be credited was less grave than that of Bradford.

█ Bradford argues that liability is imposed on Texas American by sub-part (b) of Regulation J of the Federal Reserve System, 12 C.F.R. § 210.56(b) (1981) which governs federal reserve wire transfers of funds. We disagree. This regulation, at most, placed a duty on Texas American to follow the instructions contained in Bradford's wire. Texas American owed this duty without regard to Regulation J and as indicated above, we agree with the district court that Texas American breached this duty and was guilty for negligence in failing to follow those instructions. For the reasons stated above, despite the negligence of Texas American, we conclude that Bradford must bear the loss. Accordingly, the judgment of the district court is reversed and the action is remanded to the district court for entry of judgment in favor of Texas American and against Bradford.

REVERSED and REMANDED.

---

5. Because of a special agreement between the drawee bank and the drawer, Perini, that Perini would honor all checks bearing signatures from its checkwriting machine, the loss was diverted from the drawee bank to Perini.