REVISED, MARCH 29, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-11202
_____

UNITED STATES OF AMERICA,

                                    Plaintiff-Appellee,

versus

BONIFACE SULEMAN ODIODIO,
also known as Boniface Odiodio Suleman;
VICTOR AMEACHI UZOH,
also known as Victor Uzoh,

                                    Defendants-Appellants.


_____

Appeal from the United States District Court
For the Northern District of Texas
_____

March 9, 2001

Before KING, Chief Judge, and HIGGINBOTHAM and DUHÉ, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury convicted Boniface Odiodio and Victor Uzoh of bank

fraud, wire fraud, and money laundering.  They challenge the

sufficiency of the evidence to sustain their convictions.  We are

persuaded that the government failed to show that FDIC-insured

banks were put at risk of loss by the defendants' conduct, and we

reverse the convictions for bank fraud.  We find no merit in the

appellants' other contentions on appeal and affirm those

convictions as well as the enhancement of defendant Odiodio's sentence for perjury at trial.

I

This case is centered around a misappropriation of a check written by KN Energy to Shell Western for just under one million dollars. The check was stolen from the mail, and altered to be payable to a Robert Allen Burr.

Someone by mail opened an account at Charles Schwab & Co. in the name of Robert Allen Burr, using his identifying information, including social security number and date of birth. The stolen check was deposited into the account. There was no evidence of who opened the account or made the deposit. Robert Allen Burr testified at trial that he had never seen the check nor any of the bank accounts involved. The government offered no proof of who stole the check, altered and deposited it.

Money was then transferred by wire from the Schwab account into an account at the Arlington, Texas branch of Bank One, held by Shyamal Mukherjee, and into an account at the Arlington, Texas branch of Wells Fargo, held by Odiodio. Uzoh and Odiodio then began to move money out of the country from these two accounts.

There were two wire transfer orders from Bank One, both filled out either by Mukherjee at Uzoh's behest or by Uzoh himself and then signed by Mukherjee. They describe the wire transfers as being "for land rover" and "trip money." Mukherjee does not appear

2

to have been part of the conspiracy. Rather, the evidence suggested that he was partially duped and partially coerced by Uzoh into allowing his account to be used. Mukherjee needed money to register his business with the Airline Reporting Corporation. Uzoh agreed to supply the money, and procured the information about Mukherjee's account ostensibly to facilitate the transfer of money for Mukherjee's use. Once Mukherjee noticed the amount of money that was being moved through his account, Uzoh made veiled threats against Mukherjee's family to prevent Mukherjee from interfering.

The Wells Fargo account was in the name of World Capital Trust Ltd., and was controlled by Odiodio. The application to open it states the company's annual sales as $128,271.50. Bank officials testified that the account never showed any evidence of annual sales near that amount. There was evidence of five wire transfer orders from Wells Fargo, filled out by Odiodio. None of the order forms contain any express representations.

Eventually, Schwab discovered that the opening check was stolen, and began the process of freezing accounts. Odiodio and Uzoh were arrested and charged with bank fraud, wire fraud, and money laundering. A jury found both guilty on all counts. This appeal followed.

II

We review jury verdicts with great deference. We evaluate the evidence in the light most favorable to the verdict and "afford the

3

government the benefit of all reasonable inferences and credibility choices."[1]  The evidence "is sufficient if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt based upon the evidence presented at trial."[2]

We begin by considering the sufficiency of the evidence supporting the charge of bank fraud.  The elements of bank fraud, under 18 U.S.C. § 1344, are that the defendant knowingly executed or attempted to execute a scheme or artifice 1) to defraud a financial institution or 2) to obtain any property owned by, or under the custody or control of a financial institution by means of false or fraudulent pretenses, representations or promises.[3]  The government must also show that the defendant "placed the financial institution at risk of civil liability,"[4] and that the bank was FDIC insured.[5]

---

[1] *United States v. Gray*, 96 F.3d 769, 772 (5th Cir. 1996).

[2] *Id.*

[3] *United States v. Dadi*, 235 F.3d 945, 950 (5th Cir. 2000).

[4] *United States v. Sprick*, 233 F.3d 845, 852 (5th Cir. 2000) ("Under our precedent, for the prosecution to prove that the offense of bank fraud has been committed, it must show not only that the money or assets in the custody or control of a financial institution were obtained by means of fraud but also that doing so placed the financial institution at risk of civil liability."); *United States v. Briggs*, 965 F.2d 10, 12-13 (5th Cir. 1992).

[5] *See United States v. Scott*, 159 F.3d 916, 921 (5th Cir. 1998) ("Proof of FDIC insurance is an essential element of the crime of bank fraud, as well as essential to establish federal jurisdiction.").

Charles Schwab was not insured by the FDIC, but both Bank One and Wells Fargo were insured. We turn to the issue of risk of loss.[6]

We are persuaded that under Texas law, Bank One and Wells Fargo were not at risk. It is clear under Texas law that there the banks had no legal liability. We have no occasion to assess "risk" in the light of legal uncertainty regarding liability. In *Bradford Trust Company v. Texas American Bank-Houston,*[7] two imposters sent a forged wire transfer order to the Bradford Trust Company, ordering it to liquidate certain assets in an account and wire $800,000 to Texas American Bank, in payment for a set of rare coins and gold bullion. Bradford Trust did so, without following internal procedures designed to detect fraud. The customer whose assets were sold later discovered the fraud and reported it to Bradford Trust. Bradford Trust reinstated the customer's account and sought refund from Texas American. Texas American refused and Bradford Trust sued. The district court applied comparative

---

[6] *See Sprick*, 233 F.3d at 853 ("We express no opinion on whether the bank would have civil liability in these circumstances; it is sufficient that the government provided no basis at trial or on appeal for concluding that the bank could have such liability. It follows under our jurisprudence that Sprick could not be guilty of bank fraud under 18 U.S.C. § 1344.").

[7] 790 F.2d 407 (5th Cir. 1986).

5

negligence principles and split the loss evenly between the two banks.[8]

We reversed, holding first that comparative negligence principles do not apply in such commercial cases.[9] We then looked to Texas banking law and the Texas UCC. Those laws place primary responsibility on the drawee bank for detecting forged signatures, because the drawee bank is in the best position to detect the fraud. Subsequent holders have no opportunity to detect fraud and therefore do not share responsibility. We also cited two wire transfer cases in Texas before the adoption of the UCC which followed the same reasoning. We finally observed that in commercial transactions, the law strongly favors finality. Thus, subsequent takers of an instrument or transfer should be free from claims that the person from whom they took possessed the instrument fraudulently.[10] Under the authority of *Bradford Trust*,[11] Charles

---

[8] *Id.* at 408.

[9] *Id.* at 409; *see also United States v. Hibernia Nat'l Bank*, 841 F.2d 592, 596 (5th Cir. 1988).

[10] *Bradford Trust*, 790 F.2d at 409-11.

[11] *Bradford Trust,* or the reasons supporting it, would control any case brought against Bank One or Wells Fargo. The wire transfers were received at the Arlington, Texas branches of those banks. Section 4-102(b) of the UCC provides that "[t]he liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located. In the case of action or non-action by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located." U.C.C. § 4-102(b) (2000). The transfers were received by the Arlington, Texas

6

Schwab, as the entity that initially received the altered instrument, bore the full risk of loss in this case. Charles Schwab had the greater opportunity to detect and prevent this fraud. It opened an account and accepted a check of nearly a million dollars by telephone. Bank One and Wells Fargo, having never handled the altered instrument, had none.

Texas law assigns the full risk of loss to the bank that dealt with the forger or his work. All the cases cited by the government fit this pattern.[12] Where, as here, the FDIC insured banks never handled the fraudulent instrument, they had no risk of loss. The

_____

branches of Bank One and Wells Fargo. Section 4-102 would therefore mandate the application of Texas law. Texas, where one would expect a suit against Texas banks to be brought, has adopted this provision of the Uniform Commercial Code. *See* Tex. Bus. & Com. Code Ann. § 4.102(b) (2000). Moreover, even if Schwab were able to secure jurisdiction over Bank One or Wells Fargo and bring suit in Schwab's home state of California, California has also adopted section 4-102. *See* Cal. Com. Code § 4102 (2000).

[12] Although the issue of FDIC insurance was not raised on appeal and is therefore not explicitly discussed in the cases cited by the government, the banks involved are invariably FDIC members. None of the cases cited by the government involved fraud perpetrated upon a non-FDIC institution which then transfers funds to an FDIC bank. *See United States v. Hill*, 197 F3d 436 (10th Cir. 1999) (forged check deposited at Norwest bank, which is FDIC insured); *United States v. Barakett*, 994 F.2d 1107 (5th Cir. 1993) (criminal induced victims to deposit forged checks drawn on Allied American Bank and Bank One, both of which are FDIC insured); *United States v. Wimbish*, 980 F.2d 312 (5th Cir. 1992) (stolen checks from one FDIC insured bank forged and deposited into another FDIC insured bank, with cash back requested), *abrogated on other grounds by Stinson v. United States*, 508 U.S. 36 (1993); *United States v. Young*, 952 F.2d 1252 (10th Cir. 1991) (unauthorized account in employer's name opened at FDIC insured bank, stolen checks then deposited in unauthorized account).

banks parted with no money of their own, and are not liable to replace any money lost by Charles Schwab.[13]

The evidence was insufficient to sustain Uzoh and Odiodio's convictions on the charge of bank fraud, and the judgment of conviction upon counts 2, 4, 5, and 7 is REVERSED.


III

The elements of wire fraud, under 18 U.S.C. § 1343, are 1) a scheme to defraud and 2) the use of, or causing the use of, wire communications in furtherance of that scheme.[14]

Uzoh argues that if the government cannot prove he stole the altered check, the government cannot convict him of wire fraud. This argument is without merit. Proof of theft is not an element of wire fraud.[15] The government proved, and Uzoh does not contest, that Uzoh caused wire communications to be used to transfer money

---

[13] Because we find that no FDIC bank was put at risk, we need not address the question of whether or not Uzoh and Odiodio made any misrepresentations to a financial institution. As we held in *Briggs*, the mere act of ordering a wire transfer does not in and of itself constitute a representation. 965 F.2d at 12. Moreover, the specific wire order forms at issue in this case did not contain preprinted representations to which the issuer subscribed. Odiodio may have made a misrepresentation to Wells Fargo in his application to open an account, however, when he stated the annual income of World Capital Trust.

[14] *See United States v. Izydore,* 167 F.3d 213, 219 (5th Cir. 1999).

[15] *Cf. United States v. Hamilton*, 694 F.2d 398, 400 (5th Cir. 1982) (sustaining defendant's conviction for wire fraud, because "the record is replete with evidence of fraud," even though defendant was acquitted on the charge of theft).

8

for his benefit. Therefore, all that remained was for the government to prove a "scheme to defraud" furthered by the wire transfers.

Ample circumstantial evidence supports the inference that Uzoh wired money as part of a scheme to defraud. First, Uzoh arranged to have money wired from an account falsely opened in the name of Robert Allen Burr to an account held by Shyamal Mukherjee; he then arranged to have Mukherjee wire the money oversees to accounts controlled by Uzoh. Not only did these events associate Uzoh with the theft and alteration of the KN Energy check, even if they did not prove that he himself stole and altered it, but they also look conspicuously like an attempt to hide the proceeds of an illegal transaction. Second, Uzoh made these arrangements in part by threatening the safety of Mukherjee's family. Third, Uzoh had no legitimate employment or business sufficient to explain his access to this volume of money. This circumstantial evidence, taken in the light most favorable to the verdict, could support a jury's determination that the wire transfers were part of a scheme to defraud.[16]

Odiodio argues that since he did not commit bank fraud, he could not have committed wire fraud. This is meritless. Bank fraud is not an element of wire fraud.

---

[16] *See United States v. Ismoila*, 100 F.3d 380, 389 (5th Cir. 1996) ("[U]nlawful intent to defraud may be proven by circumstantial evidence.").

Ample circumstantial evidence also supports an inference that Odiodio wired money as part of a scheme to defraud.  Odiodio also received money from the Schwab account, and then promptly wired the money out of the country.  This ties Odiodio to the theft of the check with every signal of  an attempt to launder money.  Odiodio also made inconsistent and implausible statements to explain the source of the funds.  Odiodio once claimed that he was sending the money to repay Ginaton Holdings for an overpayment; yet he also threatened to sue Wells Fargo bank for the same money, claiming it was due to him under a contract.  Odiodio had no legitimate employment or business sufficient to explain his access to this large sum of money.  This circumstantial evidence, again taken in the light most favorable to the verdict, supports the jury's verdict.[17]

IV

The elements of money laundering, under 18 U.S.C. § 1956, are that "the defendant 1) conducted or attempted to conduct a financial transaction, 2) which the defendant knew involved the proceeds of unlawful activity, 3) with the intent . . . to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity."[18]  The government proved, and

_____

[17] *See Ismoila*, 100 F.3d at 389.

[18] *United States v. Garza*, 42 F.3d 251, 253 (5th Cir. 1994)(internal quotation marks omitted).

10

neither defendant contests, that both defendants conducted a financial transaction.

Uzoh argues that without proving that he knew who stole the KN Energy check, the government cannot prove that he knew the money he dealt with was the proceeds of unlawful activity or that he intended to conceal its unlawful nature. There was ample evidence, however, to prove that Uzoh knew these funds were not legitimate, even if he did not know the name of the original thief. Uzoh's decision to move the funds through Mukherjee's account and then oversees, plus the threats he made to keep Mukherjee from asking questions, plus the absence of any plausible explanation for Uzoh's access to this large sum of money all support an inference that he knew the money was stolen.

Odiodio argues that without convicting him of bank fraud, the government cannot show he knew the funds were unlawful and intended to conceal its unlawful nature. Bank fraud, however, is not an element of money laundering. Again, the circumstantial evidence amply allowed the jury to infer that Odiodio knew this money was stolen and attempted to move it out of the country in a modern electronic flight for the border.

Viewing the evidence in the light most favorable to the verdict, we cannot say that a rational jury could not have inferred scienter.

V

We turn finally to Odiodio's challenge to his sentence enhancement for obstruction of justice. The district court, applying section 3C1.1 of the Sentencing Guidelines, imposed a two-level increase in Odiodio's sentencing level, on the grounds that Odiodio obstructed justice by perjuring himself. We review this fact finding for clear error.[19] The district court followed the Supreme Court's guidance and "review[ed] the evidence and make independent findings necessary to establish a willful impediment to obstruction of justice," and further addressed "each element of the alleged perjury in a separate and clear finding."[20] Specifically, the district court listed fourteen instances of perjury by Odiodio:

> 1. He wired $100,000 to Ginaton Holdings and $60,000 to Westminster Bank because Victor Uzoh told him a client wanted a refund of $100,000 sent to the Bank of Cyprus;
>
> 2. Uzoh told him the $100,000 was to go to the Bank of Cyprus because they made an error;
>
> 3. The information in defendant's exhibit 34 helped him to make the wire transfers Uzoh told him about;
>
> 4. Nothing clicked in his mind that maybe this was illegal or some sort of scam;
>
> 5. He did not know he was sending out stolen money;
>
> 6. He did not know the money he was dealing with was the proceeds of a crime;

---

[19] *See United States v. Storm*, 36 F.3d 1289, 1295 (5th Cir. 1994).

[20] *United States v. Dunnigan*, 507 U.S. 87, 95 (1993).

12

7.  It did not dawn on him that anything was amiss until April 22;

8.  After his accounts were frozen, it still did not occur to him that the money might be the proceeds of a crime;

9.  He did not devise a scheme to defraud financial institutions;

10.  He did not know the $100,000 he wired was stolen money;

11.  At the time he heard about Ginaton and Westminster Bank, he thought he was embarking upon a legitimate business endeavor;

12.  He did not intend to defraud a bank;

13.  In his mind, he was not dividing the spoils of stolen property with Uzoh;

14.  When he sent the money to London, he was not trying to launder money.

Odiodio argues that his statements denied *mens rea*, and to penalize him for making those statements denies him the right to deny his guilt. The right to testify, however, does not include a right to lie.[21]  We have, at least twice, upheld sentence enhancements for defendants who denied possessing a culpable mental state,[22] and we have no difficulty doing so again today.

---

[21] *See id.* at 96.

[22] *See, e.g., United States v. Morris*, 131 F.3d 1136, 1140 (5th Cir. 1997) (upholding enhancement when defendant testified that he "did not *deliberately* swerve his vehicle," based on testimony by numerous witnesses that his action had to have been deliberate) (emphasis added); *United States v. Vaquero*, 997 F.2d 78, 87-88 (5th Cir. 1993) (upholding enhancement when defendant testified "that he never intended to deal drugs," where ample witness testimony proved to the contrary).

13

Odiodio also argues that the trial court could not know his mental state, and therefore could not know he lied.  The risk of "incorrect findings of perjury by district courts," however, is "inherent in a system which insists on the value of testimony under oath."[23]  We find no error.

## VI

We REVERSE Uzoh and Odiodio's convictions in Counts 2, 4, 5, and 7 on the charges of bank fraud.  We AFFIRM Uzoh and Odiodio's convictions on the charges of wire fraud and money laundering and the district court's decision to enhance Odiodio's sentence for obstruction of justice.  We REMAND to the district court for resentencing without counts 2, 4, 5, and 7.

ENDRECORD

---

[23] *Dunnigan*, 507 U.S. at 97.

KING, Chief Judge, specially concurring:

I concur in the judgment and in all of Judge Higginbotham's fine opinion with the exception of Part II, which deals with the insufficiency of the evidence to sustain the convictions of Uzoh and Odiodio for bank fraud. I agree that the evidence is insufficient to sustain those convictions, but rather than ruling that, as a matter of law, the banks could not be at risk, I would simply say that under the evidence in this case, there was no basis on which the jury could have found that the banks were at risk.

15