GERARD E. LYNCH, Circuit Judge,
concurring in part and concurring in the judgment in part:
I join fully in all of Judge Winter’s thoughtful opinion for the Court except for part (a) of the discussion, addressing the sufficiency of the evidence supporting appellant’s bank fraud conviction. As to that section, I concur in the result, agreeing that reversal is required by our prior holdings. I write separately, however, to express my view that those prior decisions are predicated on an unwarranted and unwise judicial injection of an offense element that has no basis in the statute enacted by Congress. As a result, our Court finds itself on the wrong side of a disagreement among the Courts of Appeals on the mental state necessary to sustain a federal bank fraud conviction.
Felix Nkansah conceived and executed a plan to steal money by lying to the United States government and to various banks. The plan proceeded in two steps. First, Nkansah and his co-conspirators stole personal information from real people and, using that information, submitted tax returns in their names to the Internal Revenue Service with falsified income and address information. As a consequence, he and his confederates received refund checks from the federal Treasury, made out to the payees in whose names they had filed the returns. Second, by presenting forged identification documents, Nkansah opened accounts in the names of the payees at several federally insured banks, de *754 posited the Treasury checks into those accounts by falsely endorsing them in the names of the payees, and withdrew the proceeds from the accounts. The second step was of course crucial to Nkansah’s scam: he was not interested in collecting Treasury checks to mount on the wall; the checks were of value to Nkansah only to the extent he could negotiate them.
When the scheme unraveled, Nkansah was indicted for (among other offenses) violating 18 U.S.C. § 1344. That statute provides:
Whoever knowingly executes, or attempts to execute, a scheme or artifice—
(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means oí false or fraudulent pretenses, representations, or promises;
shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
Id. (emphasis added). On a plain reading of the second section of the statute, one would think it fits Nkansah’s behavior like the proverbial glove. He devised a scheme to obtain money from the banks at which the accounts were opened by making false representations to them, and obtained cash that had been in the banks’ hands — “under [their] custody or control.” Indeed, the naive reader would think that the statute’s drafter had carefully worded the second section to avoid creating any technical issues about whether the money that a fraudster obtained actually belonged to the bank, or whether the bank itself would suffer a financial loss; the crime is committed when a person schemes to lie to a bank (as Nkansah did, by representing himself to be another person when opening an account in that person’s name and endorsing a check payable to that person), and thereby obtain funds that had been in the bank’s custody and control (as Nkansah did, by obtaining a credit in the false account and withdrawing the funds thus made available in the form of United States currency that had been under the bank’s control). Whether the money paid out to the scammer belonged to the bank, or an account holder against whose account the check was drawn, or a correspondent bank, or the drawer of a check against an account at some other bank should make no difference: under the plain words of the statute, if the defendant lies to a bank to get cash that is held by the bank, he would seem to run afoul of the law, regardless of whether it is that bank or some other party that ultimately bears the loss.
The majority rules today, however, that the naive reader is wrong, and that Nkansah did not violate § 1344, because (1) the statute incorporates a requirement that the defendant have an intent to harm the bank that he deceived into paying him, and (2) there is insufficient evidence that Nkansah had that intention. The naive reader would, I suppose, react differently to these two propositions. The first proposition — the legal assertion that intent to harm the bank is required — seems unwarranted, since no such requirement appears in the language of the statute. To the contrary, as discussed above, the statute’s second section would appear to be written to avoid imposing such a requirement. If the statute were limited to the first section, and simply prohibited defrauding banks, this reading would be understandable, though hardly inevitable. “[T]o defraud a financial institution,” id. § 1344(1), could well be read as meaning to harm the bank by taking its money. But the alter *755 native language, “to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution,” id. § 1344(2), contains no such implication.
The second proposition, on the other hand — the factual assertion that Nkansah was not proven to have such an intent— seems only too obviously true. Whether or not the scheme actually inflicted loss on the bank at which he opened the accounts and negotiated the checks, it is hardly likely that a fraudster like Nkansah, who concocts a scheme for cashing forged or fraudulently obtained checks, harbored any animus against that particular bank, or cared whether the losses from his scheme fell on the bank that cashed his check or on the account holder against whose account the check is written — a result that, under the Universal Commercial Code, depends on the precise nature of his scheme. His intent is to profit — “to obtain any of the moneys, funds, credits, assets, securities, or other property” — not to inflict loss on any specific victim. Once it is decreed that an intent to harm the bank is a requirement of the statute, it would seem not only that some sorts of schemes are categorically beyond the reach of the statute (a result the majority acknowledges), but also that, if the requirement is taken seriously by judges and juries, and not evaded by some dubious improvised inferences, almost no fraudulent check-cashing scheme could successfully be prosecuted.
In fairness to today’s majority, they did not invent this requirement. As demonstrated by Judge Winter’s opinion, this Court has previously adopted the rule that an intent to harm the bank is a required element of a violation of § 1344. The root of the rule seems to be United States v. Blackmon, 839 F.2d 900, 904-07 (2d Cir.1988), our first case to interpret § 1344 after its 1984 enactment. There, relying in large part on legislative history, this Court held that “[w]here the victim is not a bank and the fraud does not threaten the financial integrity of a federally controlled or insured bank, there seems no basis in the legislative history for finding coverage under section 1344(a)(2).” Id. at 906.[1] It is because of these cases, including especially United States v. Laljie, 184 F.3d 180 (2d Cir.1999), that I concur in the judgment vacating the bank fraud conviction, as I agree that the result reached by the majority is compelled by our precedent.
Even so, Blackmon makes clear that the requirement of an intent to harm a bank has been from the start a judicial construct, not expressed in or even suggested by the statutory language. For judges to impose such a requirement without textual basis demands a strong policy rationale— indeed, a rationale so powerful that we can *756 only conclude that Congress must have intended the requirement to be part of the statute, and omitted specific language incorporating it inadvertently, or because it is so obviously required as a matter of well-understood principle that it truly goes without saying. Cf. Morissette v. United States, 342 U.S. 246, 261-62, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (finding unexpressed requirement of criminal intent implicit in 18 U.S.C. § 641 “in the light of an unbroken course of judicial decision in all constituent states of the Union holding intent inherent in this class of offense, even when not expressed in a statute”).
A judicially imposed requirement of intent to harm the bank would be a plausible example of such a compelling policy if it served to distinguish criminal from noncriminal behavior, as it does under 18 U.S.C. § 656, which covers various crimes against banks by their employees. But as applied in cases like this one, the requirement merely muddies the waters — or, as in this case, improperly exonerates a defendant of bank fraud — because in such cases it is clear that the defendant has perpetrated a crime, even though it may not be clear that the bank itself has sustained loss, or that the defendant understood or hoped that it would.
Under § 656, covering theft, embezzlement, and misapplication of bank funds by a bank officer or employee, we have insisted — without any express statutory language to guide us — that an intent to harm the bank be proven in order to sustain a conviction. That insistence is motivated in part by the drafting history of § 656: an express textual requirement of such an intent was edited out of the statute by a “technical” amendment, and we have kept it in order to preserve the substance of the prohibition. See United States v. Lung Fong Chen, 393 F.3d 139, 145 (2d Cir.2004). But in misapplication cases, the requirement is also necessary to distinguish criminal from innocent conduct. For example, in United States v. Cleary, 565 F.2d 43, 45-47 (2d Cir.1977), we vacated a misapplication conviction because, although the defendant had violated internal bank rules in making a loan to a third party, the district court erred by excluding evidence that the loan recipient intended to repay the loan, which might have established that the defendant had not intended to harm the bank, but had instead just broken the bank’s rules by making a risky loan. There was no evidence that the Cleary defendant had received bribes or kickbacks in exchange for making the loans, or otherwise engaged in furtive or illegal behavior, further suggesting that he had not had a wrongful intent. Id. at 47. See also United States v. Docherty, 468 F.2d 989, 995 (2d Cir.1972) (overturning a conviction under § 656 because of insufficient evidence of intent), abrogated on other grounds as recognized in United States v. McElroy, 910 F.2d 1016, 1025 (2d Cir.1990); United States v. Evans, 42 F.3d 586, 589-91 (10th Cir.1994).
In such cases, we have properly enforced the missing intent requirement of § 656 in order to distinguish criminal from innocent behavior. A bank officer may sidestep or ignore bank rules, perhaps in exchange for a kickback or bribe, to facilitate a loan that the borrower has no intention, or no plausible prospect, of repaying. When the loan is a sham, harm to the bank is likely; the schemers have a criminal intent to obtain money wrongfully, at the expense of the bank. In other cases, however, a bank officer may evade the bank’s internal rules in the good-faith belief that the borrower is willing and able to repay, and that the loan, though not authorized by the bank’s formal loan guidelines, will actually be profitable for the bank. (In some cases, indeed, the bank officer defendant may even claim that, regardless of *757 the bank’s overt rules, the bank’s management winked at or even encouraged lending supported by borrower representations that were inaccurate.) Such a banker may have violated his employer’s rules, and may even have engaged in deceptive conduct, but he lacks criminal intent and therefore has not committed the crime defined in § 656.
Thus, to distinguish overly generous bankers from criminals, we properly hold under § 656 that criminal intent is shown only if the defendant had an intention to harm the bank. The formulation works in such cases because the essence of a wrongful intent in these situations is the intent to harm, someone, and the only victim involved is the bank. The function of the rule is to separate criminals, who intend to inflict injuxy on another for gain, from persons who engage in deception in the good faith-belief that no one will suffer any loss. To be guilty of fraud in these circumstances, a defendant must intend not only to lie to the bank, or to apply its funds in an unauthorized way, but also to harm the bank. I have no quarrel with the proposition that a criminal intent to effect harm on someone is an element of a violation of § 1344 as well; it is inherent in the idea of a “scheme or artifice.”[2]
But our cases have not deployed the “intent to harm the bank” under § 1344 to distinguish criminal from non-criminal conduct, and an “intent to harm the bank” requirement certainly sexwes no such purpose in this case. There is no doubt that Nkansah had a criminally fraudulent intent. His goal was to get money to which he was not entitled, with no intention of paying it back. He obviously knew that, to produce his intended enrichment, someone would bear an unjustified loss. There is no doubt that Nkansah executed a scheme to obtain funds from the various banks by making false representations with criminal intent. The majority nonetheless applies the formulation, as we have done in prior cases, to require an intent to harm the bank. Here, the “intent to harm the bank” test distinguishes not between criminal and non-criminal conduct, but between (1) criminal conducted specifically intended to affect a bank, and (2) criminal conduct directed at a bank and for the purpose of obtaining money wrongfully from the bank by lying to the bank, but without regard for whether the bank or someone else will bear the brunt of the crime. In effect, the majority’s application expands the mens rea requirement by attaching it not only to the element of harm that delimits criminality, but also to the jurisdictional element of the statute, where it serves no such purpose.
The requirement of a wrongful intent, as in the bank officer cases under § 656, is an appropriate instance of judicial implication of an unexpressed mental element into a statute, because the requirement of mens rea is so fundamental to our concept of criminal law that courts frequently read it into statutes in the absence of an express *758 requirement. See, e.g., Staples v. United States, 511 U.S. 600, 619-20, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); Morissette, 342 U.S. at 250-63, 72 S.Ct. 240. There is no such tradition with respect to jurisdictional elements, however, because for the federal government to exercise its criminal powers over an individual, it is not logically necessary for that person to know or intend that she is transgressing a particularly federal interest.
A good example is United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), dealing with assault on a federal officer. In that case, the Supreme Court held that an intent to commit an assault was a required element of the offense of assaulting a federal law enforcement official under 18 U.S.C. § 111; that was the element that made the conduct wrongful. But the Court also held that it was not necessary to prove that the defendant intended to assault, or even knew he was assaulting, a law enforcement officer — let alone a federal officer, the element that subjects the crime to federal jurisdiction. See id. at 684-86, 95 S.Ct. 1255. Intentional assault, of anyone, is wrongful; that the victim happens to be a federal official creates federal legislative jurisdiction but does not make the act any more or less culpable.[3]
One could, of course, argue — as the majority suggests this court did in Blackmon, 839 F.2d at 904-07 — that Congress, concerned about crime that could harm the solvency of federally insured banks, chose to punish only crimes specifically directed against such institutions. But this supposed policy choice would make little sense.[4] As with assault on federal officers, *759 the protection of persons or institutions of special concern to Congress would be incomplete if it did not extend to harm inflicted by malicious individuals who did not know or care whether the harm they intended would fall on such a person or institution. Just as a criminal trying to shoot his way out of an arrest may not know or care that the officer he is shooting at is an agent of a federal, rather than a state, law enforcement agency, so (as in this case) a criminal seeking to get money from a bank by lying to the bank may not (and typically will not) know or care whether the ultimate loss will fall on that bank, on another bank, or on an account holder. The legislative history cited by the majority is not to the contrary. That history shows that Congress enacted § 1344 because of the “strong federal interest in protecting the financial integrity of [federally insured financial] institutions.” S.Rep. No. 98-225, at 377 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3517. But the fact that this interest motivated Congress to adopt the statute, and provided the jurisdictional nexus for the federalization of this class of crimes, does not imply that Congress intended the scope of the prohibition to be limited to conduct that threatened the federal interest that motivated its enactment. If Congress had so intended, it presumably would have limited the statute to major frauds, and would not have covered the various minor check frauds that are a cost of doing business for banks and in no way threaten their financial integrity.
In any event, an “intent to harm the bank” requirement does not well serve the Congressional interest in protecting federally insured banks. The government cannot adequately protect federally insured banks from loss without being able to prosecute criminals who, while undertaking schemes to obtain property under the control of such banks, are ignorant of or insouciant about whom they will harm. A check fraud that is intended to harm a bank may in the end impose no costs on the institution if the schemer misunderstands who will be responsible for the loss, while one that the perpetrator believes will damage only some other party may in fact leave the bank liable for the loss. The goal of protecting federally insured financial institutions from loss may require a prohibition that extends more broadly than merely to crimes that are specifically intended to impose such loss.
Moreover, given the difficulties of proving such intent, injecting such a requirement will make it difficult to prosecute crimes that Congress surely would have wanted to cover. Indeed, if the majority’s rule were applied seriously by judges and juries, prosecutions for bank fraud in all cases involving checks would be very difficult. Very few criminals passing checks that variously involve forged payee endorsements, forged drawer signatures, stolen or fraudulently obtained checks, and the like, who quite clearly have the specific intent to wrongfully obtain money that is in the bank’s custody or control, have any knowledge of the rules of law that govern who bears the risk of loss in the complex system by which negotiable instruments are paid. Still less do most of them care. The Hollywood version of Clyde Barrow may have asked, while robbing a bank, whether cash was the bank’s or still belonged to the would-be depositor, and left it to the poor farmer when told it was his.[5] *760 It is doubtful whether the real Barrow, or any other actual bank robber, has ever been so scrupulous. To say the least, persuasive evidence of an intent to harm the bank will be hard to come by.
The majority tries to avoid this reality by suggesting that in some cases an intent to harm the bank can be reasonably inferred where the law provides that the bank will bear the loss, and the rule of law is “well-known” or “widely understood.” See Maj. Op. at 749-50. The majority provides no empirical evidence that any rule of law governing the payment system is “well-known” to (let alone “well understood” by) anyone but a small cadre of bankers, banking lawyers, and law professors who teach courses in negotiable instruments.[6] That the Uniform Commercial Code places the risk of loss in some check frauds on the bank that accepts the check provides no genuine basis to infer that the criminal depositing the check knew (let alone specifically intended) that the bank paying the check would bear the loss, any more than the fact that the law would hold the bank harmless as a holder in due course implies that the scammer knew that the injury would not fall on the bank.
A cynic might contend that so long as judges will enforce today’s rule by allowing an inference of anti-bank animus drawn from rules of banking law to defeat motions for acquittal for insufficient evidence, prosecutors can safely charge bank fraud in cases in which the bank would in fact bear a risk of injury, and juries can be counted on to convict defendants who are shown to have engaged in clearly wrongful conduct, without worrying much about whether those defendants had actually been proved beyond a reasonable doubt to have actually intended a loss to the bank. It is perhaps true that few defendants would be so bold as to argue to a jury, “I intended to defraud, but I hoped and thought that the victims would be the bank’s customers, not the banks.” I am not cynical, however, about jurors’ ability and inclination to follow their instructions and base their verdicts on the law and the evidence, and therefore assume that many jurors will have a reasonable doubt about the dubious proposition that the defendant in fact knew or intended that the bank to which he lied, rather than some other party, would bear the cost of his scheme. But even if I thought otherwise, I would still think it an odd legal system that defined liability rules that could only be practicable on the theory that judges and juries will take short-cuts in applying them.
The mischief of the rule is limited in this case. Because the loss from Nkansah’s *761 scheme was ultimately borne by the federal Treasury, he was convicted of a separate and equally serious crime that was also charged in the federal indictment. The principal practical consequence for him is the reversal of the additional mandatory consecutive sentence for aggravated identify theft, which by law must be piled atop a sentence for bank fraud, but is not added to a tax fraud sentence. Some may mourn the elimination of the additional punishment; others may think the additional mandatory sentence excessive and be glad to see it reversed; either way, Nkansah will not avoid a significant penalty for his criminal acts.
In other cases, the requirement of a specific intent to injure a bank may have more serious consequences, making federal prosecution of some fraudulent check schemes impossible. Worse, the distinction between those that are and those that are not subject to prosecution under § 1344 is entirely arbitrary.
One need not invent hypothetical examples to illustrate the arbitrariness of the rule. United States v. Laljie, the case that in my view controls this one and compels my concurrence in reversing Nkansah’s bank fraud convictions, amply demonstrates the point. In Laljie, the evidence permitted the jury to find the defendant, who was secretary to one Schmeelk and had access to his checkbook, stole money by (1) physically altering cheeks, made payable to Cash and signed by Schmeelk, to increase the amounts, pocketing the difference between the amounts Schmeelk expected and the amount the bank paid, and (2) taking checks that Schmeelk had presigned in blank for payments to vendors, and writing in as payee a company controlled by her husband, thus diverting the funds to her own use. We upheld convictions on bank fraud counts based on the altered-amount checks, on the theory that because the bank should have noticed the physical alterations on the checks, the bank would be liable to Schmeelk for paying the increased amounts. 184 F.3d at 190-91. Apparently crucial to the holding was the fact that the alterations “were sufficiently visible to call into question the checks’ authenticity, putting the bank on notice that the maker might have a defense against it and preventing the bank from enjoying the status of holder in due course.” Id. at 190. But we vacated the convictions based on the second scheme, because the bank would not be liable for paying an apparently legitimate check that bore Schmeelk’s actual signature. Id. at 191. With respect, this makes little sense. In my view, Laljie was equally guilty of violating § 1344 for both schemes, because in each case she made false representations to the bank (misrepresenting the amounts of the checks in the first scheme and misrepresenting that the checks had been made payable by Schmeelk to the payee she had fraudulently inserted in the second[7]), as part of a scheme to obtain funds under the bank’s custody and control to which she had no lawful claim. A court that took seriously the rule that a conviction under § 1344 requires proof beyond a reasonable doubt that the defendant actually intended harm to the bank, as opposed to intending to profit himself at the expense of whoever winds up taking the hit, *762 should have trouble sustaining the conviction in either scheme, because there is no real reason to think that Laljie had any idea whether the bank would bear the loss for any of the fraudulent transactions if Schmeelk eventually discovered the abuse of his account (still less that she actually intended to harm the bank). Moreover, the clear implication of the opinion — that Laljie was only guilty of bank fraud in the case of the altered cheeks because her forgeries were so crude that the bank should have noticed them- — -is totally incomprehensible. Presumably, Laljie intended her forgeries not to be noticed by the bank, and if she had altered the amounts in such a way that the bank was not on notice of the alterations, the bank might not have been liable to Schmeelk, and the artificial chain of inferences from actual liability of the bank to the intent of the larcenous secretary would be broken. This makes no sense: the skill of the forger should not determine whether the thief is guilty of bank fraud.[8]
However unfortunate the consequences of today’s decision might be, I agree that, given Laljie and, to a lesser extent, the dictum in Blackmon, its outcome is required by the law of this Circuit. Nonetheless, I believe that this decision reverses a well-deserved conviction, and perpetuates a potential loophole that could make future prosecutions more difficult. The precedents upon which the Court relies today ignore the statute’s plain language and are unsound as a matter of policy.
Although § 1344 has produced much litigation in the Circuits and many separate opinions by learned appellate judges, federal courts do not agree on the mental state necessary to support a conviction under § 1344, nor on the relationship between the statute’s two subsections. See, e.g., United States v. Staples, 435 F.3d 860, 866-67 (8th Cir.2006) (discussing difference of opinion among Circuits); United States v. Everett, 270 F.3d 986, 990 n. 3 (6th Cir.2001) (same). Some Circuits hold, as we do, that an intent to harm the bank, or at least expose it to risk, is required. See, e.g., United States v. Odiodio, 244 F.3d 398, 401 (5th Cir.2001); United States v. Davis, 989 F.2d 244, 246-47 (7th Cir.1993). But other Circuits hold a variety of other views. For example, the First Circuit, overruling earlier precedents, has held in a unanimous en banc decision that under either subsection, § 1344 requires only an intent to defraud a bank, and not an intent to harm a bank. United States v. Kenrick, 221 F.3d 19, 26-29 (1st Cir.2000).[9] The Third Circuit has relied in *763 part on Kenrick to conclude that “where the perpetrator had an intent to victimize the bank by exposing it to loss or liability, such conduct falls comfortably within the reach of § 1344,” but that “where there is no evidence that the perpetrator had an intent to victimize the bank, ... merely an intent to victimize some third party does not render the conduct actionable under § 1344.” United States v. Leahy, 445 F.3d 634, 647 (3d Cir.2006). The Third Circuit thus requires not intent to harm, but intent to victimize, which appears to include a case, such as this one, in which the bank was the “target of deception.” Id. at 646-67 (internal quotation marks omitted).[10] The Sixth Circuit, relying on the plain language of § 1344(2), has held that it is “sufficient if the defendant in the course of committing fraud on someone causes a federally insured bank to transfer funds under its possession and control.” Everett, 270 F.3d at 991. The Eighth Circuit has held that while subsection (2) requires “ ‘some loss to the institution, or at least an attempt to cause a loss,’ ” while subsection (1) only requires that the defendant have “ ‘defraud[ed]’ ” the institution. Staples, 435 F.3d at 867, quoting United States v. Ponec, 163 F.3d 486, 488 (8th Cir.1998).[11] My own view, as expressed in this opinion, is consistent Judge Lipez’s careful opinion in Kenrick for the unanimous First Circuit.
Thus, while the force of our Court’s precedent compels me to concur in the judgment of the Court, I am firmly convinced that we are on the wrong side of the conflict among the circuits on the issue that controls this case, and I hope and trust that when the Supreme Court sees fit to resolve the conflict, it will reject our Circuit’s rule.

. In Blackmon itself, this language is arguably dictum, as it is much broader than necessary to resolve that case, which involved a somewhat different problem than that at issue in this case. In Blackmon (unlike this case), the scheme involved no misrepresentation to a bank, and the schemers did not obtain any money directly from a bank. Rather, the scheme involved a face-to-face con game intended to fleece individual victims. Those victims obtained the money that they entrusted to the fraudsters by withdrawing it, perfectly legally and without making any false representations, from their own bank accounts. See 839 F.2d at 902 n. 2 (quoting the district court's description of the scheme). The problem was not merely that there was no intent to harm the bank in question — there was no conduct directed at or involving a bank at all. The result in Blackmon, it seems to me, was entirely correct; it cannot be bank fraud to deceive an individual into turning over her cash, simply because the victim had to get the cash from a bank. In this case, however, Nkansah and his colleagues got their money illicitly from the bank by making false statements to the bank. Blackmon thus does not control the result in this case.

. Such a rule could find application under § 1344 as well. If, in a case like Cleary, while participating in a course of conduct to obtain money under the bank’s control — loan proceeds — from the bank, the bank officer makes or aids the borrower to make a false representation to the bank, the officer might be prosecuted under § 1344 as easily as under § 656. I agree that in such a case, the absence of a criminal intent to harm anyone would be a defense; if the officer believed in good faith that the misrepresentation was innocently intended to further a transaction that would in the end benefit the bank, he or she would lack any criminal intent. But the critical fact is the absence of an intent to harm. A case such as the present one, in which the defendant has a malicious intent to steal, and the defense is that he lacked an intent to harm the bank because he neither knew nor cared where the ultimate loss would fall, presents an entirely different issue.

. It is not universally the case that no culpability requirement at all attaches to jurisdictional elements. For example, it has been held that under the mail (and wire) fraud statutes, the use of the mails (or wires) must have been at least reasonably foreseeable. See, e.g., United States v. Maze, 414 U.S. 395, 399, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). But even in such cases, courts do not require a specific intent to use the mails. As we recognized in Blackmon, "This court has unambiguously held that there is no mens rea requirement as to the purely jurisdictional element of interstate communication under the wire fraud statute.” 839 F.2d at 907, citing United States v. Blassingame, 427 F.2d 329, 330-31 (2d Cir.1970). In any event, there is little reason to require mens rea with respect to purely jurisdictional elements, and the omission of such an element is the preferable rule. See National Commission on Reform of Federal Criminal Laws, Study Draft of a New Federal Criminal Code § 204 cmt. (1970) ("Since jurisdiction is only a question of which sovereign has the power to punish certain harmful conduct, it follows that, in general, the degree of an offender’s culpability does not depend upon whether he does or does not know when he commits the offense which sovereign will be able to prosecute him.”); id. § 204 (as part of draft proposal, "[ejxcept as otherwise expressly provided, culpability is not required with respect to any fact which is solely a basis for federal jurisdiction”).

. Blackmon appears to have made the same mistake that the majority does today. That case cited legislative history indicating that Congress was concerned with the expanding scope of the wire and mail fraud statutes, and on that basis read § 1344 narrowly. See 839 F.2d at 906. But the legislative history cited in that case makes clear that in being cautious about the expansive scope of mail and wire fraud, Congress was concerned that "due process and notice argue for prohibiting such conduct [bank fraud] explicitly, rather than through court expansion of coverage.” Id., quoting H.R.Rep. No. 901, 98th Cong., 2d Sess. 4 (1984). That is a concern about notice, not federal jurisdiction. Nothing in the legislative history cited in Blackmon, and nothing I have been able to find, specifically addresses the situation before us in the present case, or suggests — much less makes clear — that Congress intended to require a specific intent to inflict financial loss on a bank when a person obtains money from a bank by lying to the bank in connection with a criminal scheme to obtain money to which he has no claim of right.

. See the script to the film Bonnie and Clyde (Warner Brothers/Seven Arts 1967), available at http://www.imsdb.com/'scripts/Bonnie-andClyde.html:
Cut to CLYDE standing near the door, training his guns on the entire bank. A farmer stands a few feet away, some bills clutched in his hand.
*760 CLYDE: That your money or the bank’s?
FARMER: Mine.
CLYDE: Keep it, then.
Id. at 62.

. It is my strong intuition that most ordinary citizens, confronted with the facts of this case, or of the converse case, in which the majority would apparently permit conviction, in which a criminal forges the signature of an account holder on a check stolen in blank and presents the check to the drawee bank, would have the slightest idea whether the bank is liable as a matter of law for paying on the check. (I admit that I have no empirical evidence for my intuition, either, but I doubt that the majority would like to put the thesis to a test by giving a short quiz to next week’s jury venire.) Indeed, in this very case, the government called a witness from the Federal Bureau of Investigation, Agent Peck, who testified that the banks would be at risk of loss, but later admitted that he was unsure whether any bank had ultimately borne any loss in this case. That a government agent charged with responsibility for investigating suspected violations of § 1344 could offer only such "murky testimony,” Maj. Op. at 750-51, suggests that verdicts should not be made to turn on inferences from supposedly "well-known” or “well understood” rales of loss allocation.

. In Laljie, there is a plausible argument that in depositing the checks payable to the husband's company into an account of that company, Laljie made no misrepresentation to any bank. But no such argument can be made by Nkansah. He deposited the checks into accounts fraudulently opened, presumably by the presentation of forged identification, in the names of the persons whose identities had been hijacked in the underlying fraud on the Internal Revenue Service. There is thus no doubt that Nkansah made multiple misrepresentations to the banks to whom the checks were presented.

. There are many variant scenarios in which fraudsters deceive banks using false, forged, fraudulently obtained, or stolen checks. A scammer may steal blank checks and forge the account-holder’s signature; create false checks that appear to be legitimate checks drawn on an actual account; present fraudulently created checks that are based on entirely fictitious accounts; forge the endorsement on a legitimate but stolen check made payable to a third party; alter the name of the payee or amount on a stolen check; and many more. In any of these cases, the criminal may present the check to the drawer’s bank or to another bank, and may deposit the check into her own account or into an account in a fictitious name or in the name of an actual person to whom the check was drawn, that the con artist opened using false identification. The forgeries in any of these cases may be clumsy or skillful. I leave it to the reader to work out in which if any of these instances the bank to whom the check was presented, or any other bank, is liable for paying on the check, whether any of the rules that determine the result are "well-known” or "well understood” by anyone but a banker or bank lawyer, and whether, under the rule of our Circuit, a defendant charged with bank fraud in any of these variant instances can be found by a jury to have intended a loss to the bank.

. The Ninth, Tenth and Eleventh Circuits have adopted a similar rule. See United *763 States v. McNeil, 320 F.3d 1034, 1037-40 (9th Cir.2003); United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir.2001); United States v. Sapp, 53 F.3d 1100, 1103 (10th Cir.1995).

. See Leahy, 445 F.3d at 645 n. 9 (explaining the distinction, and noting that "[w]ere there a specific intent to harm element, a jury might not convict a defendant whose intent was to enrich himself or steal from a third party, yet who lacked any desire to harm or injure the bank”).

. This is somewhat akin to the distinction I advance in this opinion, although I take the opposite view of which subsection has which effect.